## Targus Group International, Inc. vs. Howard Sherman & others.[1]

No. 08-P-113.

Suffolk. November 4, 2008. - March 5, 2010.

Present: KATZMANN, SIKORA, & RUBIN, JJ.

*Practice, Civil,* Summary judgment. *Contract,* What constitutes, Construction of contract, Implied covenant of good faith and fair dealing, Performance and breach, Damages. *Damages,* Breach of contract, Interest.

Discussion of the standard used to review the allowance of summary judgment in cases involving the interpretation of a contested written contract. [428]

In a civil action brought by a plaintiff seeking to enforce a disputed settlement agreement resulting from mediation, the judge hearing the defendants' motion for summary judgment did not err in concluding that the settlement agreement was complete [428-431] and contained no elements of critical indefiniteness [431-432], and that the parties intended to be bound by it [432-434].

In a civil action brought by a plaintiff seeking to enforce a disputed settlement agreement resulting from litigation, the judge erred in ordering summary judgment in favor of the plaintiff on its claim of breach of the implied covenant of good faith and fair dealing, where the issue of the defendants' state of mind was left unresolved as a genuine issue of material fact. [435-436]

In a civil action alleging breach of contract, the judge, in calculating compensatory damages for losses arising from the defendants' failure to deliver stock in accordance with the contract at issue, did not err in the selection of a date for the valuation of the shares that served as a reasonable approximation of value and damages [436-437]; further, the judge did not err in fixing the dates of breach for the purpose of calculating prejudgment interest [437-438] and correctly deducted from the award of prejudgment interest the amount of all interest earned upon sums withheld by the defendants in an escrow account [438].

CIVIL ACTION commenced in the Superior Court Department on November 9, 2004.

The case was heard by *Allan van Gestel,* J., on a motion for summary judgment, and entry of a final judgment was ordered by him.

[1]Sean Brosmith and Scott Oshry.

*Michael B. Keating (David A. Kluft* with him) for the defendants.

*Richard D. Batchelder, Jr. (Daniel J. Bennett* with him) for the plaintiff.

SIKORA, J. The issue of this appeal is the enforceability of a disputed settlement agreement resulting from mediation. The mediation produced an itemized "Agreement in Principle" (AIP or agreement) between the parties. The AIP called for the execution of final settlement documents and mutual releases. Over the ensuing three months the parties exchanged three drafts of final papers. When that drafting process appeared to stall, the plaintiff Targus Group International, Inc. (Targus or company), began suit in the Superior Court against the defendants Howard Sherman, Sean Brosmith, and Scott Oshry (Sherman group or group) for enforcement of the AIP by remedies of damages and specific performance. The Sherman group denied liability and subsequently moved for summary judgment. A Superior Court judge allowed the motion against three ancillary claims by Targus, but denied it upon Targus's claims of breach of the AIP and breach of the covenant of good faith and fair dealing implicit in the AIP. Upon those counts he ordered the entry of summary judgment in favor of Targus pursuant to Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002).[2] By supplemental rulings, the judge ordered payment of compensatory damages from the Sherman group to Targus in the amount of $4,140,770, with substantial prejudgment interest, and specific performance of certain indemnification and release terms. The resulting judgment hinges on the validity of the AIP. "Once again we consider in what circumstances a writing, which by context or by terms contemplates a more formal agreement, may nonetheless serve as a binding contract." *Goren* v. *Royal Invs. Inc.*, 25 Mass. App. Ct. 137, 138 (1987).

*Factual background.* The following undisputed facts emerge from the summary judgment record.

1. *The parties' business relationship.* In 1992 the Sherman group founded Roundhouse, Inc. (Roundhouse). Sherman served as its chief executive officer, and Brosmith and Oshry as vice-

---

[2]"Summary judgment, when appropriate, may be rendered against the moving party." Mass.R.Civ.P. 56(c).

presidents. All three were directors and shareholders. Roundhouse dealt in the sale of various consumer goods.[3]

In 2000 Targus purchased one hundred percent of the stock of Roundhouse in exchange for $79 million in cash and Targus stock. During the next two years, Targus concluded that the Sherman group had not accurately represented Roundhouse's financial condition and resulting stock purchase value, and called upon the group to pay damages for breach of warrantied representations underlying the purchase price. The Sherman group countered that Targus had made certain misrepresentations about its financial condition apparently affecting the value of the Targus stock received by the group as part of the acquisition price for their Roundhouse shares.

2. *The mediation process.* In June, 2003, the parties agreed to undertake mediation. They executed a detailed agreement with a highly regarded mediator in Boston. An opening session went forward in Boston on August 15, 2003. All principals and their counsel attended. That session did not produce a solution. During the ensuing months, the parties kept open the mediation process as Targus furnished the Sherman group with requested information about the Targus claims.

On July 13, 2004, a second formal mediation session took place in Boston. It extended from the morning until near midnight. Targus appeared in the person of an authorized director, two accounting experts, and counsel; Howard Sherman, an accounting expert, and counsel appeared for the Sherman group. At the conclusion of the session, the mediator drafted the AIP and submitted it to the parties. After inspection, the principals signed it (Sherman for the group; the Targus director for the company); their counsel signed also; and the mediator initialed it. It provided as follows:

"Agreement in Principle

"Targus Mediation

"July 13, 2004

"Howard Sherman, Sean Brosmith, and Scott Oshry ('Sell-

---

[3]The record appendix refers to clothing and compact disc case lines of business.

ers') and Targus Group International ('Company') agree in principle to settle all the claims, causes of action and disputes between them arising out of or relating to the acquisition of Roundhouse by the Company on August 31, 2000, on the following terms and conditions:

"1. Sellers retain 3,000,000 Company shares; return the balance of 781,803 shares.

"2. Sellers pay Company $2,500,000.00 as follows:

— $500,000 personal note from Sellers payable within 6 months of settlement and personally guaranteed by sellers;

— $2,000,000 upon a liquidity event for Company, not guaranteed, non-recourse.

"3. Sellers' stock in Company to be pledged and escrowed against the back end payment obligation; pledge to be clean for filing purposes.

"4. Sellers not entitled to Board seat.

"5. Sellers remain passive shareholders, i.e. no communications to Company employees (other than personal communications unrelated to the Company), board or advisors. Sellers shall receive from the Company only audited financial statements so long as they remain shareholders.

"6. Company will look into whether it has sold the CD Projects and Glacier Gear lines of business. As to such, if it has sold the businesses not subject to the non-competes, it will terminate the non-competes as to those lines.

"7. Execution and exchange of final settlement documents and mutual releases in a form satisfactory to counsel, including release of any claims by Sellers for severance under the Roundhouse Option Plan. The releases shall indemnify, defend and hold harmless Sellers from any claims, causes of action, cross-claims or demands arising out of or relating to the Company's filing of

any claims against other Roundhouse selling share-
holders.

"/s/ [Howard Sherman]    /s/ [Director William P. Logan]
For Selling Shareholders   For Targus

"APPROVED AS TO FORM AND CONTENT:
"/s/____Counsel_____    /s/____Counsel_____
Attorneys for Shareholders   Attorneys for Targus

"EDG
(Mediator)."

3. *Proposed final documents.* On August 11, 2004, counsel
for Targus forwarded to counsel for the Sherman Group a draft
final settlement agreement. The draft release by Targus recited
that Targus "indemnifies [the three members of the Sherman
group] . . . from any and all claims . . . arising out of or relat-
ing to the acquisition of Roundhouse, Inc. by Targus on August
21, 2000 . . . ." A short covering electronic mail message
(e-mail) by Targus counsel made no specific reference to the
provisions of the draft. By a responsive e-mail of September 8,
2004, Sherman group counsel inquired about term 6: whether
Targus had sold its compact disc case business line so as to
release the Sherman group from its obligation (apparently under
the stock sale agreement of 2000) to refrain from competition in
that product. On the same day Targus counsel replied that Tar-
gus retained that business (a possible sale had "fallen through")
so that the noncompetition covenant would remain in force.

At some point several weeks after the July 13, 2004, mediation
session, the Sherman group proposed to Targus that the company
offer to all Roundhouse shareholders the option to settle with Tar-
gus on the same terms provided to the three members of the
group. The parties do not dispute that such a proposal passed
between them. However, the record does not tell us the date or
the identities of the communicants.[4]

On September 24, 2004, Sherman group counsel forwarded

---

[4]Appropriate postargument letters from counsel to the panel provided as-
sistance about the course of dealing after the July 13, 2004, mediation, but
could not specify these details.

to Targus counsel a responsive draft. The covering e-mail addressed several details about implementation of the AIP. It then proposed that, since the lines of business covered by the non-competition covenants restricting the Sherman group remained within the control of Targus for divestment, Targus "should" release the covenants. It characterized this point as a "belie[f]" and did not insist upon it as a new term. As to protection for the Sherman group in the event of Targus claims and litigation against other former Roundhouse shareholders for recovery of overpayment, the draft (1) extended the opportunity to all such former shareholders to settle with Targus on terms similar to those provided the Sherman group by the AIP, and (2) maintained Targus's agreement in term 7 of the AIP to indemnify the Sherman group against all liability resulting from Targus claims against such former shareholders (i.e., potential third-party claims by those shareholders against the Sherman group).

On October 14, 2004, Targus counsel forwarded the third draft. The covering e-mail to Sherman group counsel recited the belief that the "current draft accurately reflects [the terms recorded with the mediator], and we believe is ready for execution. Please let me know as soon as possible whether there are any remaining issues. We would like to get the papers signed no later than next week." This draft retained the provision extending the settlement opportunity to former Roundhouse shareholders. It deleted the provision for indemnification of the Sherman group.

When the Sherman group did not respond to the third draft, Targus commenced suit twenty-six days later for specific enforcement of the AIP, including its own duty to indemnify the Sherman group against any claims resulting from Targus action against other former Roundhouse shareholders.

4. *Targus's subsequent merger.* On November 22, 2005, Targus formally merged with a separate entity known as Targus Acquisition Corp. so as to accomplish the cancellation of all outstanding Targus stock. As of that date the Sherman group had not returned the 781,803 shares of stock, or paid the $500,000 at a time six months after the final mediation, or pledged their remaining 3,000,000 shares of Targus stock to secure the $2,000,000 payment obligation, as provided in terms 1, 2, and 3, respectively, of the AIP. Consequently the merger process created a "Holdback Escrow Account" (escrow account)

as security for any eventual recovery against the Sherman group. The escrowed amounts included (a) the value of 781,803 Targus shares at the share price of $2.0987 as of the date of the "liquidity event" of the merger, or the sum of $1,640,769.96; (b) $2,000,000 claimed due at the time of the "liquidity event"; and (c) $500,000 claimed due at a time six months after settlement.

5. *The Superior Court decision.* After examination of the substantial summary judgment record, the judge concluded that the AIP "was a result of an elaborate process of sophisticated mediation"; that it furnished all the essential terms of a completed agreement; and that the contemplated final documents would constitute a memorialization of that already binding agreement. The judge concluded further that "[n]owhere in the Agreement in Principle does it say, or even hint, that it is qualified or that the parties intend only to be bound by the execution of some more detailed agreement."

Upon that reasoning, the judge ruled that the Sherman group had violated the AIP and its implied covenant of good faith and fair dealing so as to entitle Targus to the remedies of substantial compensatory damages: (1) the sum of $500,000 due as of January 13, 2005, a date six months after the settlement created by the AIP on July 13, 2004; (2) the sum of $2,000,000 payable upon the liquidity event of the merger of November 22, 2005; and (3) the value of the 781,803 shares of unreturned Targus stock, to be set as of the date of the merger at $2.0987 per share. The judge ruled also that Targus was entitled to prejudgment statutory interest at the rate of twelve percent from the dates of the respective breaches (January 13, 2005, and November 22, 2005) with two deductions: (1) the amount of market interest earned by the respective sums of $500,000 and $2,000,000 in the escrow account maintained by Targus after the merger; and (2) the amount of interest held by Targus upon the excess sum in the escrow account.[5] The final judgment included an order for the execution of the releases prescribed by

---

[5] The record does not disclose the amount of that excess. The judge did not have the reliable information necessary to compute it. The record contains an affidavit from Sherman dated May 3, 2007, reporting that the Sherman group had tendered their shares shortly after November 22, 2005, and that after negotiations the Targus representatives had delivered $3,861,895 to them on

the AIP and for Targus's indemnification of the Sherman group from any liability resulting from Targus claims against other former Roundhouse shareholders. The Sherman group timely pursued the present appeal.[6]

*Discussion.* 1. *Standard of review.* In review of the allowance of summary judgment, an appellate court works from the same record as the motion judge and decides the motion de novo. See *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007); *Eastern Holding Corp.* v. *Congress Financial Corp.*, 74 Mass. App. Ct. 737, 740 (2009). The test is whether the evidence, viewed in the light most favorable to the losing party, establishes all material facts and entitles the successful party to a judgment as a matter of law. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991); *Kennie* v. *Natural Resource Dept. of Dennis*, 69 Mass. App. Ct. 158, 161 (2007). The interpretation of a contested written contract is a question of law ordinarily appropriate for disposition by summary judgment. See *Lumber Mut. Ins. Co.* v. *Zoltek Corp.*, 419 Mass. 704, 707 (1995); *LoCicero* v. *Hartford Ins. Group*, 25 Mass. App. Ct. 339, 341 (1988). A dispute over a writing clearly stating the rights and duties of the parties becomes especially suitable for summary decision. See *USTrust* v. *Henley & Warren Mgmt., Inc.*, 40 Mass. App. Ct. 337, 341-343 (1996).

2. *Validity of the AIP.* An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms. See *McCarthy* v. *Tobin*, 429 Mass. 84, 87 (1999); *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000). The Sherman group contends that the AIP lacks the

---

June 8, 2006, but had retained more than $4,000,000 as security for potential damages resulting from this litigation.

[6]Targus's complaint presented five distinct claims: count one for breach of the 2003 agreement for mediation by refusal to participate in good faith; count two for breach of the AIP for failure to execute final settlement papers; count three for breach of the implied covenant of good faith and fair dealing within the 2003 mediation agreement; count four for breach of the implied covenant of good faith and fair dealing within the AIP; and count five for unfair or deceptive conduct as to both agreements in violation of G. L. c. 93A, § 11. The judge allowed summary judgment in favor of the Sherman group upon counts one, three, and five; and entered summary judgment against the Sherman group upon counts two and four. Targus has not appealed from the adverse judgments entered on counts one, three, and five.

completeness, the definiteness, and the binding intentions of the parties necessary for enforcement.

(a) *Completeness.* As evidence of incompleteness, the group emphasizes that the parties titled the mediation result as an agreement "in principle" and required the creation of further documents to conclude their settlement. Massachusetts courts have found preliminary writings to be incomplete and nonbinding in circumstances in which essential terms remained unresolved or in which the participants visibly reserved their commitment for the later documents. The decisions invoked by the Sherman group belong to that category of "imperfect negotiation."[7] See *Wilcox, Inc.* v. *Shell Eastern Petroleum Prods., Inc.*, 283 Mass. 383, 387-390 (1933) (the parties' preliminary agreement for the provision of gasoline service station supplies lacked important terms of pricing, quantities, delivery frequency, payment process, and advertising responsibilities); *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 217 (1935) (a preliminary agreement for a commercial lease left open multiple important terms of the tenancy); *Levenson* v. *L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 128-130 (1991) (the parties' preliminary writings about the conveyance of an apartment building required a subsequent purchase and sale agreement "satisfactory to both parties," a phrase deferring the seller's commitment).

The use of the phrase "in principle" and the need for further documents does not preclude the formation of a binding agreement. Sufficient completeness depends upon the substance of the terms approved by the parties.[8] "No contract otherwise binding is to be treated as a nullity solely because it is a contract

---

[7] The phrase originated in the case of *Lyman* v. *Robinson*, 14 Allen 242, 252 (1867), in which the court concluded that the parties' exchange of terms by correspondence omitted too many significant elements for a completed and binding agreement. As a modern example of this category, see especially *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 628-630 (1979) (the parties' communications about the terms of a long-term commercial lease left open points of the financing and timing of improvements so as to remain only "an agenda for further discussion").

[8] The Sherman group cites several Federal decisions for the proposition that an agreement "in principle" referring to a later "formal agreement" amounts to a nonbinding agreement to agree. See *Skycom Corp.* v. *Telstar Corp.*, 813 F.2d 810, 814-815 (7th Cir. 1987) (significant terms unresolved); *Empro Mfg. Co.* v. *Ball-Co Mfg., Inc.*, 870 F.2d 423, 425-426 (7th Cir. 1989) (language of

to execute still another document or instrument in the future."
*Sands* v. *Arruda,* 359 Mass. 591, 594 (1971). "It is not required
that all terms of the agreement be precisely specified, and the
presence of undefined or unspecified terms will not necessarily
preclude the formation of a binding contract." *Situation Mgmt.
Sys., Inc.* v. *Malouf, Inc.,* 430 Mass. at 878 (enforcement of an
oral agreement to extend a prior commercial agency relationship
by a later contract). The parties' arrangement for a later, final
writing may signify not incompleteness but rather the subsequent
memorialization of an already accomplished agreement. See, e.g.,
*McCarthy* v. *Tobin,* 429 Mass. at 86-88; *Goren* v. *Royal Invs.
Inc.,* 25 Mass. App. Ct. at 141 (an accepted offer to purchase real
property may create a binding agreement in advance of the pur-
chase and sale agreement); *Basis Technology Corp.* v. *Amazon.
com, Inc.,* 71 Mass. App. Ct. 29, 37-38 (2008) (a litigation settle-
ment agreement contemplating a later final agreement contained
sufficient essential terms for enforcement).

Here the text of the AIP and the undisputed circumstances of
its formation support its completeness. The document makes no
reference to unresolved issues or unfinished business. It anticipates
no further mediation sessions. All principals signed; simultane-
ously, their attorneys signed the document with "APPROV(AL)
AS TO *FORM AND CONTENT*" (emphasis supplied). By contrast,
the AIP calls for the execution and exchange of final settlement
documents and mutual releases only "in a *form* satisfactory to
counsel" (emphasis supplied), terminology indicating that the
AIP had resolved all matters of "content" or substance and that
the parties were progressing from the negotiation of terms to the
details of implementation.

The AIP culminated from a professional mediation process
begun thirteen months earlier by a detailed contract and con-
ducted by a recognized expert. During the interim the parties
engaged in a first extensive session (in August, 2003) attended

reservation in a letter of intent); *20 Atlantic Ave. Corp.* v. *Allied Waste Indus.
Inc.,* 482 F. Supp. 2d 60, 74 (D. Mass. 2007) (reservation clause in a letter of
intent). These cases appear to be distinguishable examples of "imperfect
negotiation" typified by *Tull* v. *Mister Donut Dev. Corp., supra.* See note 7,
*supra.* Contrast *White* v. *Fleet Bank of Maine,* 875 A.2d 680, 683 (Me. 2005)
(cited by Targus but affirming an oral agreement in principle resulting from
mediation as sufficiently complete for enforcement). The determinant is not
the title of the parties' communication, but rather the adequacy of its terms.

by principals and attorneys, and thereafter exchanged pertinent information. The climactic meeting of July 13, 2004, involved the principals, their attorneys, their financial experts, and the mediator, and extended from morning until almost midnight. The elaborateness of that process indicates further that the resulting AIP, drafted and initialed by the mediator, comprehended all essential terms for a resolution of the parties' dispute.

(b) *Indefiniteness.* The Sherman group characterizes two material terms of the AIP as too indefinite for enforcement and therefore fatal to the validity of the settlement. The first is the provision in term 2 that the group will make a payment to Targus of $500,000 "within 6 months of settlement." They view that due date as uncertain. The second is the provision of term 6 that Targus will determine whether it has sold two lines of business (certain clothing and compact disc items) and, if so, will release the Sherman group from existing noncompetition covenants.

Ambiguous or indeterminate material terms can render an attempted agreement too uncertain for enforcement. See *Blair* v. *Cifrino*, 355 Mass. 706, 709 (1969); *Epstein* v. *Zwetchkenbaum*, 356 Mass. 22, 23-24 (1969); *Community Builders, Inc.* v. *Indian Motocycle Assocs., Inc.*, 44 Mass. App. Ct. 537, 556 (1998). However the law does not demand impracticable precision from contracting parties. If they identify present unknowns or subsequent contingencies and provide mechanisms or norms for their accommodation, their agreement will be binding. See *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 517-519 (1998) (approving a formula for calculation of the price of redevelopment land amid later major uncertainties); *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. at 878-879 (a party's general oral promise to renew the terms of a prior commercial agency contract was sufficiently definite for enforcement); *Basis Technology Corp.* v. *Amazon.com, Inc.*, 71 Mass. App. Ct. at 38-39 (a party's acceptance of a referenced and discoverable stock conversion formula was binding upon it even though it had not specifically consulted the formula at the time of agreement).

The due date for payment of the $500,000 within six months of settlement does not create serious uncertainty. In instances of ambiguity, a court may furnish a time element reasonable in the circumstances of the parties' dealings. *Middleborough* v. *Middle-*

*borough Gas & Elec. Dept.*, 47 Mass. App. Ct. 655, 658-659 (1999). See *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 342 (1979). Here the judge chose January 13, 2005, six months from the execution of the AIP, as the date. The choice was certainly reasonable. It treated the AIP consistently both as a valid contract and as the effective "settlement" of the parties' disputes. The only rational alternative date, one six months after the execution of the proposed final documents and releases, never materialized.

The subject of the noncompetition covenants did not comprise an element of critical indefiniteness. It presented a verifiable objective contingency accepted by the Sherman group. Either Targus had, or had not, divested the lines of product underlying the restriction upon the Sherman group. Targus reported on September 8, 2004, that it had retained the compact disc case business and therefore would maintain the pertinent covenants. Two weeks later the Sherman group counsel proposed that Targus release the covenants voluntarily, but not as a matter of contractual duty.

(c) *The intent to be bound.* Finally, the Sherman group challenges the requisite intent of Targus to be bound by the terms of the AIP. As evidence of a genuine issue of material fact, it points specifically to Targus's treatment in the post-AIP drafts of its promise in term 7 to indemnify the group against subsequent claims by other former Roundhouse shareholders. The Sherman group argues that Targus intentionally treated the indemnification issue as unresolved by the AIP and still open for continuing negotiation.

In the analysis of this contention the critical first point is that the requisite intent is the "present intent" at the moment of the formation of a contested agreement. See *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. at 878; *Basis Technology Corp.* v. *Amazon.com, Inc.*, 71 Mass. App. Ct. at 39.[9] A careful exam-

---

[9]The Sherman group relies upon cases in which subsequent conduct exposes earlier disagreement or misunderstanding in the formation of an agreement so as to negate the required intention. See, e.g., *Blomendale* v. *Imbrescia*, 25 Mass. App. Ct. 144, 146-147 (1987); *Vickery* v. *Walton*, 26 Mass. App. Ct. 1030, 1032 (1989); *Coldwell Banker/Hunneman* v. *Shostack*, 62 Mass. App. Ct. 635, 636-637 (2004). For the reasons to follow, the record here does not reveal as a genuine issue of material fact any lack of informed intention to be bound on the part of any party.

ination of the record does not uncover as a genuine issue of material fact an inadequate intent to be bound by the AIP by either side.

The text of the AIP is telling. In the opening sentence the parties recite that they "agree" to settle all pertinent "claims, causes of action and disputes" upon the ensuing seven terms. The main verb of the document, "agree," uses the present tense and the unqualified indicative mood. It does not state that they "will agree" in the future upon fulfillment of any open conditions. It embodies a current intent of all signatories. Further, the AIP does not employ any "invalidating clause" or reservation of agreement until execution of later final documents of implementation, an option extended by the case law to parties unprepared for a firm commitment. See *Goren* v. *Royal Invs. Inc.*, 25 Mass. App. Ct. at 142-143. Additionally, all the factors indicating the completeness of the AIP and itemized above serve also to substantiate the signatories' completed acceptance of its terms: the sophistication of both principals and counsel; the signed approvals of both principals and attorneys; the endorsement of the mediator; and the absence of references to unfinished terms or future mediation sessions.

Finally, the underlying mediation process would promote a considered result. The duration of the entire process (thirteen months), the exchange of information, the guidance of a skilled mediator, the participation of counsel and financial experts, and the extended final session would naturally inform and ripen the parties' intentions. The deliberative quality of the process bringing parties to a settlement can evidence the firmness of their intentions to agree. See *Basis Technology Corp.* v. *Amazon.com, Inc.*, 71 Mass. App. Ct. at 43 (advanced litigation will have educated the parties about the strengths and weaknesses of their positions and guided their willingness to settle).

In our view, the parties' exchanges of final drafts and e-mails during the ensuing three months did not present a genuine issue of material fact of their intentions to be bound at the time of the execution of the AIP. In the course of their post-AIP drafting of implementation papers, the Sherman group proposed a release from their noncompetition covenants and the extension of equivalent settlement opportunities to other former Roundhouse shareholders; Targus appeared to want to retreat from its indem-

nification of the Sherman group possibly in exchange for the added settlement opportunity for the other Roundhouse shareholders. As a matter of fact, this post-AIP angling and probing for incremental benefits or favors operated independently of the core agreement and left it intact. Neither side conditioned its commitment to the AIP upon the other's acceptance of a later proposal.[10,11] As a matter of law, neither side could do so. See Restatement (Second) of Contracts § 61 & comment a (1981); Williston on Contracts § 6:16 (4th ed. 2007); Corbin on Contracts § 3-30 (rev. ed. 1993) (all to the effect that acceptance of specific terms followed by "grumbling" or by "request" for addition or modification does not negate agreement upon those terms unless the party demands assent to its request). In short, the afterthought proposals here were failed embellishments of the durable core agreement. Without the consent of the other for an alteration of terms, each was bound to the AIP formed by their intentions on July 13, 2004.[12]

---

[10]In the course of his memorandum and order for summary judgment, the judge commented, "To this Court, what occurred in the exchange of settlement-paper drafts following the execution of the Agreement was confirmation of the aphorism that 'the enemy of good is perfect.' " In our view and in the judge's terms, neither side abandoned a "good" compromise in pursuit of a "perfect" result.

[11]Targus's deletion of its indemnification promise in the October draft created the impression of a potential breach of the AIP. However, when the Sherman group did not respond to the draft, Targus reaffirmed its compliance with the AIP by its November lawsuit for specific enforcement of all its terms.

In the Superior Court, one of the Sherman group counsel submitted an affidavit statement that Targus counsel had made a post-AIP comment that the company would not indemnify the Sherman group. If we were to treat the affidavit representation as admissible nonhearsay under Mass.R.Civ.P. 56(e), it would not undermine the binding validity of the accomplished AIP, but rather suggest a subsequent breach if Targus had acted upon such a renunciation of a material term. See note 12, infra.

[12]The Sherman group accurately observes that here, in contrast with the circumstances in Basis Technology Corp. v. Amazon.com, Inc., 71 Mass. App. Ct. at 41, the parties' postagreement discussion addressed a provision of the original agreement — the promised indemnification of the group by Targus in term 7. However, the clarity of the AIP prevents the inference (and any genuine issue of material fact) that such a term was open or unresolved. The AIP shows a firm and settled term. If Targus had repudiated that commitment, the Sherman group could have invoked its remedies for a breach by Targus. The group could have either (a) sued for specific performance and/or damages, if any, or (b) claimed or sued for excusal of its performance by reason of Targus's breach of material term. See, e.g., Petrangelo v. Pollard, 356

3. *Breach of the implied covenant of good faith and fair dealing.* The judge ordered the entry of summary judgment of liability against the Sherman group upon Targus's separate claim for breach of the implied covenant of good faith and fair dealing. That order concerned liability only; it did not result in any additional remedies for Targus or sanctions against the Sherman group. The judge's memorandum of decision did not treat that claim separately from the Targus claim of simple breach of contract. No distinct findings or reasoning addressed that count. The judge may have found implicitly that the Sherman group's unjustified nonperformance of the AIP warranted an inference of bad faith or at least a lack of good-faith dealing.

The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-472 (1991), quoting from *Drucker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976). See *Uproar Co.* v. *National Bdcst. Co.*, 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936). Its violation usually requires more than a simple breach. See *Nagel* v. *Provident Mut. Life Ins. Co. of Philadelphia*, 51 Mass. App. Ct. 763, 768-769 (2001) (affirming summary judgment of simple breach but reversing summary judgment of breach of the implied covenant because the motion judge had found liability for the latter "for the same reasons" as the former). Usually, a breach of the implied covenant involves "bad faith" conduct "implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of the fraud." *Equipment & Sys. for Indus., Inc.* v. *Northmeadows Constr. Co.*, 59 Mass.

---

Mass. 696, 701-702 (1970); *Clamp-All Corp.* v. *Foresta*, 53 Mass. App. Ct. 795, 810 (2002).

The Sherman group did neither. Targus then confirmed its intention to be bound by the AIP by commencement of the present suit for specific enforcement of all its terms. In short, the AIP endured through the postagreement discussions or maneuvers.

In circumstances of an ambiguous writing, the discussions of altered terms might furnish evidence casting doubt upon the firmness of the parties' intentions. Even so, Massachusetts law would favor interpretation producing "a valid and enforceable undertaking rather than one of no force and effect." *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. at 517, quoting from *Shayeb* v. *Holland*, 321 Mass. 429, 432 (1947). The clarity of the AIP controls our case.

App. Ct. 931, 932-933 (2003). See *Boston Pilots* v. *Motor Vessel Midnight Gambler & E. Coast Excursions, Inc.*, 357 F.3d 129, 135 (1st Cir. 2004); *Christensen* v. *Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (both observing that breach of the implied covenant usually indicates deceitful mentality). Determination of a party's state of mind is usually unsuited for summary judgment. See *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991); *Sudbury* v. *Scott*, 439 Mass. 288, 302 (2003).

Here the summary judgment record leaves the mentality of the Sherman group unresolved as a genuine issue of material fact. Both sides engaged in post-AIP bargaining over implementation. The e-mails covering their exchanges of drafts were generally concise and unrevealing about motives and good or bad faith. The bargaining and any developing view of motives ended abruptly with the start of litigation. Because the question of good faith remains disputable, we reverse the summary judgment in favor of Targus upon this claim.[13]

4. *Damages issues.* (a) *Valuation of the Targus stock unreturned by the Sherman group.* The group argues that the judge incorrectly used the merger date, November 22, 2005, as the point of valuation of the 781,803 shares of Targus stock retained by the group in violation of term 1 of the AIP. The price per share on that date was $2.0987. Under the rule of *George* v. *Coolidge Bank & Trust Co.*, 360 Mass. 635, 641 (1971), breach of a contract to deliver stock amounts to conversion of the stock and entitles the wronged party to "the fair market value at the time of conversion or failure to deliver." The Sherman group reasons that the breach of their duty to deliver the shares occurred within a reasonable time after the mediation agreement or within the interim between that date (July 13, 2004) and the commencement of suit by Targus on November 9, 2004, and that the judge should have conducted an evidentiary hearing to determine the appropriate date and value per share. We infer that such an earlier date would produce a lower value per share and less damages for payment by the group.

In the circumstances, a more fundamental principle of com-

---

[13]This outcome accords more closely with the judge's entry of summary judgment in favor of the Sherman group upon Targus's charge of unfair or deceptive conduct under G. L. c. 93A, § 11 (count five of its complaint).

pensatory damages is controlling. As a remedy for the uncertainty of business losses, Massachusetts law permits a reasonable approximation of compensatory damages. The principle of reasonable approximation applies with particular force in circumstances of indefiniteness caused by the wrongdoer's fault. See *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 626-627 (1964) (and authorities collected) (breach of contract); *National Merchandising Corp.* v. *Leyden*, 370 Mass. 425, 430 (1976) (interference with contractual relations); *Zimmerman* v. *Bogoff*, 402 Mass. 650, 662 (1988) (breach of fiduciary duty); *Our Lady of the Sea Corp.* v. *Borges*, 40 Mass. App. Ct. 484, 488 (1996) (tortious misappropriation). Here we have no earlier determinable date or price for the transfer of the shares because the Sherman group breached a contractual duty to tender them within a reasonable time after formation of the AIP. The record shows no range of change in the share price over any period of time. Consequently, the judge's selection of the share price resulting from the arm's-length merger of November 22, 2005, serves as a reasonable approximation of value and damages.[14]

(b) *Prejudgment interest.* For judgments resulting from breach of contract, G. L. c. 231, § 6C, as amended by St. 1982, c. 183, § 3, directs the award of prejudgment interest "at the contract rate, if established, or at the rate of twelve percent per annum from the date of the breach." The AIP established no interest rates in the event of breach. For the $500,000 payment due within "6 months of settlement," the judge correctly fixed the date of breach as January 13, 2005, and set the statutory entitlement in motion from that day. He accurately set November 22, 2005 (the occurrence of the "liquidity event" by merger), as the date of breach by nonpayment of the $2,000,000. In addition, he reasonably set November 22, 2005, as the breach date for the Sherman group's failure to return the value of the 781,803 shares or (at $2.0987 per share) the sum of $1,640,769.96. (In

---

[14]Before entry of final judgment, the judge, by a memorandum and then by an order, called upon the parties to submit papers addressing the terms of a comprehensive final judgment. He identified one of the terms as the value of the 781,803 shares. By affidavit Sherman reported that the group had attempted to tender its shares "[s]hortly after" November 22, 2005. That information failed to create any genuine issue of material fact of an alternate tender date and value. It left the judge with November 22, 2005, as the closest valuation date.

this particular, the indefiniteness caused by the breach benefited the Sherman group. An earlier breach date would have generated a lengthier interest stream.)

(c) *Deduction from prejudgment interest.* In accordance with the judge's intention to prevent duplicative recoveries, the Sherman group is entitled to a deduction from its prejudgment interest obligation in the amount of the total interest earned by all funds withheld by Targus representatives in the escrow account from inception through the pendency of this litigation. No subtraction from that total shall result from any delay in the transmittal by the Sherman group of its Targus shares after the merger. The allowance to Targus of any overlapping interest from both the statute and the escrow account would constitute redundant awards.

*Conclusion.* We affirm summary judgment in favor of Targus upon the claim of breach of contract (count two). We reverse summary judgment in favor of Targus upon the claim of breach of the implied covenant of good faith and fair dealing (count four). We affirm the assessment of compensatory damages and statutory interest recited in the final judgment. We affirm also the reduction of the Sherman group's statutory interest obligation by the amount of all interest earned upon sums withheld by Targus in the escrow account, as ordered by the judge.

*So ordered.*