Curran, Dennis J., J.
Corporate Development Associates, Inc. alleges that it is owed fees in relation to an acquisition made by Staples, Inc. of PRINTSouth/Miami Systems, a company engaged in the manufacturing and printing of business forms. Corporate Development has sued Staples for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) quantum meruit and unjust enrichment; (4) violation of G.L.c. 93A; and (5) misrepresentation and fraud.
The matter is before the Court on the defendant’s motion for summary judgment which asserts that: (1) Staples never agreed, orally or in writing, to pay a fee to Corporate Development, and thus, its claims are barred by the statute of frauds, G.L.c. 259, §7; (2) Corporate Development was not the efficient and predominating cause of the transaction at issue; and (3) Staples received no benefit from Corporate Development because the latter entity played no role in facilitating the negotiations between Staples and PRINTSouth.
After reviewing both parties’ papers and a hearing, the defendant Staples’s motion must be ALLOWED for the following reasons.
BACKGROUND
The summaiy judgment record reveals the following undisputed facts.
Corporate Development has been engaged in the business of consulting in corporate mergers, acquisitions, and divestitures, specifically focusing on the printing industry, since 1987. Staples is in the office supply business, and recently entered the printing industry through the acquisition of printing companies. PRINTSouth, a company involved in the printing and manufacturing of business forms, was looking for companies in the printing industry with whom it could form a strategic partnership. PRINTSouth’s President, Mr. Richard Campbell, was assigned the project of identifying and contacting such companies.
In December 2007, Mr. Campbell contacted Mr. Mike Cate, then a representative of Corporate Express Document & Print Management, a company later acquired by Staples. In May 2008, Mr. Campbell again contacted Mr. Cate regarding a potential partnership or transaction between Corporate Express and PRINTSouth. In June 2008, Staples bought Corporate Express, along with the services of Mr. Cate.
In March 2009, Corporate Development’s principal, Mr. Jim Anderson, reached out to Staples by contacting Mr. Cate. Mr. Anderson asked Mr. Cate if he believed Staples would be interested in adding to its printing business. His goal was not to participate in any negotiations between PRINTSouth and Staples, but merely to bring the two parties together to facilitate a deal. Wfhen asked what his role was, Mr. Anderson stated that his service could be viewed as an introductory agent. Mr. Anderson asked whether Staples would be interested in a buy-side fee agreement with the party who identified potential acquisitions. Instead, Mr. Cate informed Mr. Anderson that it was not within *620 his power to sign a buy-side fee agreement, and he also later made it clear that he (Cate) had no power to sign a confidentiality agreement.
Following this exchange, Mr. Anderson began providing information regarding PRINTSouth to Cate by email. He sent Mr. Cate one such email on April 5, 2009 in which he referred to an attached “[s]ample ‘buy-side’ Fee Agreement” that he stated “[did] not have to be signed just yet” See Exhibit 5 (emphasis supplied). The pertinent language in the draft fee agreement stated: “Staples Print Solutions Div. of Staples, Inc. (Client) engages Corporate Development Associates, Inc. (Consultant) to identify and introduce Miami Systems Corporation and/or PRINTSouth Corporation (Prospects) to Client . . . for acquisition or other such transaction with Client or affiliates.” Mr. Anderson never spoke with anyone else at Staples about the draft fee agreement nor did he ever forward a copy of the agreement to anyone else at Staples. In short, no Staples representative ever signed the draft fee agreement.
In May 2009, Mr. Anderson made an attempt, through an intermediary, to find out if PRINTSouth’s owner, Mr. Sam Peters, was interested in selling his company. This effort was unsuccessful. By June 2009, Mr. Anderson had not yet contacted Mr. Peters directly. Rather, he contacted PRINTSouth’s bank, PNC, to discuss other purchasing options, such as buying PRINTSouth’s debt. This was done because Mr. Anderson could not “get to first base with Mr. Peters or even set-up a meeting.” A PNC representative told Mr. Anderson that a confidentiality agreement would need to be signed by Staples before even discussing such a purchase.
Mr. Anderson forwarded the confidentiality agreement to Mr. Cate and requested that he sign it. Mr. Cate responded that “[t]his [the confidentiality agreement] will have to go through our legal group and I will need to discuss [it] with my boss before I engage in any discussions.” Mr. Anderson acknowledged this requirement by an email dated June 30,2009. Following this exchange, Mr. Cate directed Anderson to Mr. Jay Mehta, a member of Staples’ corporate development department. As of July 2009, Mr. Mehta was Mr. Anderson’s primary contact person at Staples.
Staples never entered into a transaction with PNC or any other lender in purchasing PRINTSouth’s debt. By September 2009, Mr. Anderson appears to have become frustrated over the possibility of a transaction concerning Staples and PRINTSouth. After September 2009, he had no contact with Staples. After losing contact with Mr. Anderson and Corporate Development, in November 2009, Mr. Cate was contacted by Mr. Campbell regarding “potential opportunities” with PRINTSouth. Mr. Cate acknowledged that Staples might be interested in business with PRINTSouth. After numerous meetings and negotiations between Staples and PRINTSouth representatives, Staples acquired PRINTSouth on December 3, 2010. Upon hearing of this event, Mr. Anderson sent Staples a bill for $320,660.
While Mr. Anderson was speaking with Staples about purchasing PRINTSouth, the only communication he had with Mr. Peters was by email in December 2009 in which Mr. Anderson did not mention Staples. Mr. Peters countered by reminding Mr. Anderson of a prior dispute between them, and told Anderson not to call unless he was ready to resolve that dispute.
Mr. Anderson now alleges that Staples owes him $320,660 for facilitating its acquisition of PRINTSouth.
DISCUSSION
I. The Standard of Review
A motion for summary judgment will be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007). The moving party must affirmatively demonstrate the absence of a triable issue, and that the summary judgment record entitles it to a judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). If the moving party does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991). Where the moving party has satisfied its burden, the nonmoving party must “go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991).
II. The Statute of Frauds Applies
As a threshold matter, the Court must resolve the issue of the applicability of the statute of frauds. That law, embodied in G.L.c. 259, §7, holds that:
Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business . . . shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized. [T]he term “negotiating” shall include identifying prospective parties, providing information concerning prospective parties, procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. The provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation . . .
*621 The operative section of that law “should be interpreted broadly to further its policy determination that agreements for compensation for certain services be in writing.” Cantell v. Hill Holiday Connors Cosmopulos, Inc., 55 Mass.App.Ct. 550, 552-53 (2002). For G.L.c. 259, §7 to apply in this case, the services that Corporate Development provided must fall within the statute.
Based on a reading of the statutory language, Corporate Development must be considered either a broker or a finder to satisfy the statute’s requirements. The undisputed facts evince that Mr. Anderson was not a broker because a broker, “(a]cts as an intermediary or negotiator, especially between prospective buyers and sellers.” Black’s Law Dictionary 219 (9th ed. 2009). The fact that Mr. Anderson never contacted PRINTSouth’s owner, Mr. Peters, makes it clear that he never acted as an intermediary or negotiator between the prospective parties to the transaction. Without being a parly to any negotiations, Mr. Anderson cannot satisfy the definition of a broker, and thus does not satisfy that definition under the statute.
However, Mr. Anderson, when asked: “[s]o it’s an introduction service, that is it?” responded: “(i]t could be, yes.” This statement shows that Anderson was a “finder” for the purposes of G.L.c. 259, §7. A finder is:
An intermediary who brings together parties for a business opportunity, such as two companies for a merger, a borrower and a financial institution . . . A finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usually participates in the negotiations.
Black’s Law Dictionary 707 (9th ed. 2009) (emphasis added).
Regardless of whether Mr. Anderson is labeled a broker or a finder, the undisputed facts show that he was in the business of introducing two or more parties. He provided these introductions so that those parties might consider the prospect of a business opportunity by making a contract on their own respective terms. Based on these facts, the statute of frauds applies to this case. The question is then presented as to whether this statute is satisfied here to create an enforceable agreement between the parties.
III. The Statute of Frauds Is Not Satisfied
We next address Staples’s contention that it is entitled to judgment as a matter of law because it never agreed, orally or in writing, to pay a fee to Corporate Development, and thus Corporate Development’s claims are barred by the statute of frauds. That statute requires that an agreement exist in writing signed by the party to be charged for such a broker or finder agreement to be enforceable. The broad interpretation of G.L.c. 259, §7, as suggested by the court in Cantell “furthers the manifested legislative purpose ‘to discourage claims for commission based on conversation which persons heard differently or remembered differently.’ ” 55 Mass.App.Ct. at 553. This same reasoning can extend to the case before us as to what the parties have led themselves to believe had occurred as opposed to what had actually occurred. It bears mention that “[ejxpectations and negotiations fall far short of a binding agreement.” Brighton Packing Co. v. Butchers’ Slaughtering & Melting Ass’n, 211 Mass. 398, 405 (1912). Here, there were only expectations of an agreement because there is no evidence of any back-and-forth negotiations between the parties regarding the draft fee agreement.
It is well established that the form or manner in which the memorandum sought to satisfy the statute has no bearing on that memorandum’s efficacy, so long as all essential terms are present along with a signature by the party to be charged. A.B. C. Auto Parts, Inc. v. Moran, 359 Mass. 327, 329 (1971). It is also well established that there need not be a single writing that embodies all essential elements along with the required signature, but that multiple documents, when read together, may satisfy the statute. See Schmoll Fils & Co. v. Wheeler, 242 Mass. 464, 469 (1922). By enacting the Uniform Electronic Transactions Act, our legislature has made it clear that an electronic record may satisfy any law that requires a written memorandum. G.L.c. 110, §7. This includes contracts, laws requiring written records, and electronic signatures. G.L.c. 110, §7(b)-(d).
As a result of the adoption of the Uniform Act, courts have ruled that multiple emails between parties, so long as they contain all essential terms, may create a binding contract and satisfy the statute of frauds. See Feldberg v. Coxall, 2012 WL 3854947 at *6 (Mass.Super.Ct. May 22, 2012) [30 Mass. L. Rptr. 150] (allowing certain portions of an email to satisfy the signature portion of the statute). The case of Shattuck v. Klotzbach, also cited by the plaintiff Cor-. porate Development, stands for the proposition that email negotiations may satisfy the statute even though the emails lacked a formal script signature. 2001 WL 1839720 at *4 (Mass.SuperCt. Dec. 11, 2001) [14 Mass. L. Rptr. 360]. These cases, however, are distinguishable from the present case because they involved multiple emails which ultimately evidenced a meeting of the minds on the essential terms of the transactions between the parties. Id. (stating that a purchase price of $1,825,000 had been reached); Feldberg, 2012 WL 3854947 at *3 (referring to deposit checks and loan-to-down-payment ratios). Such exchanges demonstrating an agreement are lacking here because there is no evidence before the court that Staples and Corporate Development ever exchanged emails discussing the essential elements of the transaction. That a draft agreement was sent, that its sender specifically advised the other party that “it need not be signed just yet,” and finally, that such email was never again mentioned in any later communication simply fails to *622 manifest a meeting of the minds or agreement on the essential terms of the transaction.
Here, there is neither a writing nor a compilation of writings that, when viewed in a light most favorable to the nonmoving party, would lead this court to believe that there was “(a]n enforceable agreement [which] requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms.” Targus Grp. Intern. v. Sherman, 76 Mass.App.Ct. 421, 428 (2010). Staples never accepted the terms of the draft fee agreement proposed by Mr. Anderson. The fact that Mr. Anderson now believes that the draft fee agreement had been forwarded on to the proper authorities at Staples and therefore, that that corporation ought to be bound is of no legal consequence. This dispute goes to the very purpose of the statute of frauds — to prevent misunderstandings based simply on hope, surmise and speculation. See Cantell, 55 Mass.App.Ct. at 553; Brighton Packing Co., 211 Mass. at 405. Moreover, at no time did Corporate Development make an effort to obtain a binding signature from an authorized Staples official.
In cases where the defendant pleads the affirmative defense of the statute of frauds, “the burden [is] on the plaintiff either to prove a memorandum sufficient to satisfy the statute or to prove a contract to which the statute did not apply.” Beaver v. Raytheon Mfg. Co., 299 Mass. 218, 219 (1938). This court finds that as a “finder,” the statute of frauds does apply, it was pled by the defendant Staples, and the burden devolves upon Corporate Development to demonstrate that the statute has been satisfied.
Throughout the many emails, the only reference made to the draft fee agreement was by Mr. Anderson in an email dated April 5, 2009, in which he specifically admitted that the agreement did not yet need to be signed. Exhibit 5. It is undisputed that the draft fee agreement was never signed, and that no representative at Staples ever mentioned the agreement in an email containing a typewritten name or script signature. These facts, as understood by this court, leave the statute of frauds unsatisfied, and as a result, the breach of contract, quantum meruit and unjust enrichment claims must be dismissed as a matter of law. See Cantell, 55 Mass.App.Ct. at 554.
IV. The Statute of Frauds Bars All Other Claims
Finally, we address the remaining claims brought by Corporate Development of the breach of the implied covenant of good faith and fair dealing; quantum meruit and unjust enrichment; violation of G.L.c. 93A; and misrepresentation and fraud. Corporate Development argues that it was the party who introduced Staples to PRINTSouth and that with this introduction, Staples received a benefit from Corporate Development and such efforts translate into the efficient and predominating cause of the acquisition, thus triggering Mr. Anderson’s entitlement to a fee.
Corporate Development’s failure to satisfy the statute of frauds bars all remaining claims because they are derivative of the breach of contract claim. See Cantell, 55 Mass.App.Ct. at 554-55. Without a valid, enforceable contract in place, there can be no implied covenant of good faith and fair dealing. See Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 471 (1991) (stating that “every contract implies good faith and fair dealing”). Contra SAR Group Ltd. v. E.A. Dion, Inc., 79 Mass.App.Ct. 1123 (2011) (finding that with an enforceable contract, the claim for breach of good faith and fair dealing was still active). Moreover, without an enforceable contract, there can be no claim for quantum meruit and unjust enrichment. Cantell, 55 Mass. at 554. As a result of Corporate Development’s failure to satisfy these claims, there can be no action for an alleged violation of G.L.c. 93A or misrepresentation because those claims are also derivative of the breach of contract claim and the claims for quantum meruit and unjust enrichment. Id. at 556. This case involves a sophisticated businessman operating in the highly competitive world of mergers and acquisitions; this was no ordinary consumer; and the conduct alleged here does not justify a claim for unfair business practices. Provenzano v. Plymouth Rock Assur. Corp., 2008 WL 466395 at *2 (Mass.App.Div. Feb. 19, 2008).
V. Corporate Development Was Not the Efficient and Predominating Cause
Even beyond the hurdle posed by the statute of frauds, it is undisputed that Mr. Anderson never contacted PRINTSouth’s owner, Mr. Peters, and as a result, Corporate Development cannot plausibly be found to be the efficient and predominating cause of the transaction. Under similar circumstances in Can-tell, the court held that the plaintiff could not recover for being the efficient and predominating cause because: (1) the plaintiff never obtained a serious interview for the candidate with the defendant, (2) a significant time period elapsed between the introduction and the defendant offering the candidate a job, and (3) the candidate obtained the later interview through her own efforts. Id. Here, Mr. Anderson neither contacted Mr. Peters nor introduced Staples to PRINTSouth. Staples made no deal with PRINTSouth until more than a year after Corporate Development had ended its efforts. Finally, Mr. Campbell, PRINTSouth’s President, contacted Mr. Cate, then a representative of Corporate Express, regarding a possible partnership or transaction more than a year before Corporate Development contacting Mr. Cate, now a representative of Staples. Based on these facts, Corporate Development will not be able to show that it was the efficient and predominating cause of the transaction. Coupled with its inability to satisfy the statute of frauds, these failures render a fatal blow to the plaintiffs claims.
*623 ORDER
For these reasons, the defendant Staples’s motion for summary judgment must be ALLOWED. Judgment shall enter for the defendant Staples forthwith.