Locke, Jeffrey A., J.
INTRODUCTION
After a ten-day juiy-waived trial at which the testimony of 15 witnesses (14 in court and one by way of deposition) and 140 exhibits were introduced, and also including a view of the Tobey Homestead on September 28, 2011,1 make the following factual findings and rulings of law, as necessary to resolve the issues raised in the four consolidated cases before me.[2] Because the issues presented may, in the main be resolved by several key determinations, it is not necessary to make findings of fact on every disputed factual issue, many of which are in the end tangential or immaterial to the outcome of these cases. Moreover, in the findings of fact as expressed herein, I have kept in mind and applied the respective burdens of proof as to the party making particular factual assertions.
That said as preamble, I find the following facts from the evidence accepted as credible and make rulings of law as necessary to resolve the instant litigation.
*278 FINDINGS OF FACT
The four separate cases all involve at their core, the Tobey Homestead (the “Homestead"), so-called, consisting of a parcel of land in the Narrows District of Wareham, with a house and barn. Originally constructed in 1825 in the Federal style, the house was purchased in 1837 by Jared Tobey, a prominent industrialist, who lived there with his wife and family until his death in 1870. Tobey’s widow, Susanna, enlarged the structure in 1870, adding a front portico, a rear ell-addition, and a mansard roof. The house was occupied for generations by the Tobey family and was titled to a surviving daughter, Alice Tobey Jones. Upon her death in 1922, Jones bequethed the property (subject to a life estate for her husband) in trust for the creation of the Tobey Hospital. Because Jones’ bequest involved a public purpose, the bequest fell under the jurisdiction of the Attorney General and the probate court.
Tbe Tobey Hospital was incorporated in 1938. The hospital was built on land, originally part of the 30-acre Tobey property, immediately behind the old Homestead. The Homestead structure was used by the Hospital to house nurses until, in 1985, it was ravaged by fire. Because of its post and beam (balloon) construction, the fire extended up three floors at the rear of the house and burned through a substantial portion of the roof in the southwest corner.
Following the fire, the Homestead sat exposed to the elements and unoccupied. The Hospital considered the cost of repairs and obtained estimates ranging from $800,000 to $1.2 million to renovate the structure. Concluding that such a costly renovation was not within the budget, the Hospital determined that the Homestead should be razed. To demolish the structure, however, the Hospital was required to obtain permits (Certificate of Hardship and Certificate of Appropriateness) from the Wareham Historical Commission because the Homestead sat in the Narrows Historical District (a zoning district) and had been placed on the National Register of Historic Places. The Hospital was denied its permits, a decision that was upheld on a suit in the Superior Court and affirmed on appeal. Thus the Hospital, having declared its desire to rid itself of the bumed-out shell, and unable or unwilling to expend funds for repairs, left the Homestead to the weather the elements on its own. It was, to all, a blight to the community and engendered animosity between townspeople and hospital administrators.
Wareham had its fair share of community activists, historians, and preservationists. During the decade after the fire, town leaders and concerned citizens explored ways to preserve and restore the Homestead but nothing concrete came to pass from these discussions. Town leaders and preservation activists were successful, however, in designating the Main Street district in which the homestead was situated as a historic district, and in denying the hospital’s request for a demolition permit.
Meanwhile, the Hospital, like community-based health care systems across the country, was operating under severe fiscal constraints and sought a mechanism to stabilize itself in order to serve the health care needs of the people of Wareham and surrounding towns. Hospital administrators from Tobey, the Charlton Hospital in New Bedford, and St. Luke’s Hospital in Fall River, decided to merge under a single corporate umbrella known as the Southcoast Hospital Group, Inc. (“Southcoast”).[3] Dr. Ronald Goodspeed, formerly the president of the Charlton Hospital, became the President of Southcoast. Elaine Meredith, formerly the chief financial officer of the Tobey Hospital, became a Vice-President of Southcoast and the site administrator for the Tobey campus. Meredith reported to Paul Gauthier, Vice President of Southcoast in charge of facilities.
In late 1996, following the Southcoast merger, Goodspeed undertook to resolve the issue of the Homestead. Discussions took place with interested town leaders and concerned citizens, including members of the Wareham Historical Society. Ben Dunham, vice chair of the Wareham Historical Society, Nancy Miller, and George Decas (a local attorney) participated in discussions and explored ways to preserve the Homestead. At some point another local attorney, Jan Wolverton, became involved in the discussions. Goodspeed articulated Southcoast’s interests as ensuring that its financial resources were focused on patient services and care while finding a vehicle to preserve the Homestead and insure its long-term financial viability without cost to the hospital. Proposals were explored and exchanged during 1997 and resulted in a multi-faceted plan. Southcoast agreed that it would grant a long-term lease to an entity that would restore the Homestead (at its own expense) within a specified time period, and would seek necessary approvals from the Attorney General and Probate Court to deviate from the terms of the Alice Tobey Jones will. In return, the entity to be created would agree that if the Homestead was not restored on time, they would not contest Southcoast’s right to demolish the building consistent with a hardship permit to be obtained from the Historical Commission.[4]
To carry out the plan, the Tobey Homestead Restoration Trust (the “Trust”) was incorporated in October 1997, as a not-for-profit corporation whose principal (though not only) purpose was to enter into a lease for the Homestead. Nancy Miller was named as the president and Attorney Wolverton was designated as clerk. Following the Trust’s creation, Southcoast obtained a conditional certificate of hardship, permitting it to raze the Homestead structure if not renovated according to the lease terms, and sought and received authorization from the Probate Court to enter into a lease with the Trust.
*279 In September 1998, following negotiations and exchanges of draft agreements, Southcoast and the Trust entered into a restoration and lease agreement.[5],[6] Entitled, “Ground Lease,” the agreement provided, inter alia, a 99-year lease of the Homestead to the Trust for $1.00 per year, to be used or sub-let by the Trust for any purpose not incompatible with the Hospital’s mission.[7] Clause 15 of the Ground Lease required the Trust complete certain conditions within established time periods. Within two years, the Trust had to (1) complete exterior restoration of the Homestead; (2) enter into a contract for interior renovations with a real estate developer (approved by Southcoast); (3) obtain financing for the project through fundraising or by a binding loan commitment from a commercial lender (on conditions to be approved by Southcoast); and (4) obtain all necessary permits for the scope of restoration work. It further provided that the entire restoration (exterior and interior work) would be completed, and an occupancy certificate obtained, in three years (subject to a one-time three-month extension, and tolling provisions for delays due to permitting or Southcoast approvals). The Trust’s failure to perform under Clause 15 was specifically designated as grounds for default, permitting Southcoast to retake possession, subject only to the right of the Trust to move the Homestead structure if it failed to obtain an occupancy certificate within three years.
During discussions leading to the Ground Lease, Dr. Goodspeed expressed concerns to the Trust regarding its ability to raise the necessary capital to restore the Homestead. Perhaps too optimistically, the Trust estimated renovation costs at between $150-200,000.[8] Nancy Miller said she was confident there were funding sources. She said they could get a $50,000 grant from the state, donations from the town, that Congressman Barney Frank was involved, that a local state representative would file a budget request for $100,000, and that the Trust would conduct fundraising activities and solicit local businesses to donate materials and supplies.
The Trust soon affiliated itself with a local contractor named Paul Pearle. Pearle, an electrical contractor by training, lived in the oldest house in Wareham and had a passion for historical preservation. He had been involved with or served as construction supervisor for many restoration projects, including the restoration of a Wareham historical treasure known as the Wigwam, for which he received an award from the Massachusetts Historic Commission. Nearing retirement, Pearle viewed the Homestead restoration as a capstone for his career and offered to serve as the restoration and construction supervisor for the project at no charge. His involvement, from 1998 through November 2001, appears to have been full-time and all-consuming.
Pearle presented the Trust (which forwarded to Southcoast for approval) with a restoration proposal in October 1998.[9] The proposal was submitted on behalf of “SRP Associates,” which consisted of Pearle, Stuart E. Marks and Robert P. Marks.[10] Robert Marks was a Massachusetts attorney with whom Pearle became acquainted who told Pearle he could access money from his brother, Stuart. Stuart Marks was a dentist in Woodmere, New York with an interest in historic preservation. More pertinent to the instant case, the Marks brothers had a side enterprise of loaning money through an account called “SEM,” the loans funded by Stuart and managed by Robert.
The SRP proposal described the scope of work in general and planned to construct seven or eight luxury apartments. The proposal was accepted by the Trust and subsequently approved by Southcoast.[11] What was lacking at the outset (and throughout much of the project) was working capital. There was a substantial delay in obtaining a tax-exempt designation for the Trust, which in turn caused delays in the Trust’s ability to solicit and obtain monetary donations.[12] Over time, the Trust raised approximately $74,000 from community-based fundraising activities (bake sales, raffles, psychic readings, and solicitations) and a donation from the Makepeace Foundation. Nancy Miller and other Trust officers explored other funding sources but found roadblocks in the terms of the Ground Lease. For instance, one grant source was the Massachusetts Historical Commission but it required the property owner to enter into a perpetual preservation restriction. Because the Ground Lease had a provision for razing the structure if it were not restored within the time permitted under the lease, the Trust was not eligible for grant funding.[13] Later efforts to obtain conventional bank financing for the project were unsuccessful because Southcoast would not subordinate certain rights under the Ground Lease to a bank mortgage.
In the winter or early spring of 1999, Pearle informed the Trust that he could obtain money to begin work on the exterior renovations. He was not specific about the source of the funds, other than saying that he knew some people from other projects who would provide short-term loans which could be repaid when donations were received. By the spring or summer of 2000, however, it became clear, first to the Trust and then to Southcoast, that Pearle was funding much of his restoration work through loans from Stuart and Robert Marks. As of June 2000, the Marks had loaned the project $151,000.
Restoration work proceeded as permitted by the availability of funds and to some extent dictated by New England weather. Although the Ground Lease called for exterior renovations to occur in the first two years, Pearle had to perform structural work inside to carry the roof. He had to remove and reframe floors, ceilings, and other structural elements in the rear portion of the house in addition to renovating the exterior. By the summer of 2000 (as the two-year *280 milestone required by Clause 15 of the Ground Lease approached), the exterior was close to completion.
Notwithstanding the progress that had occurred, other requirements of the Ground Lease were unmet. Commencing in the spring of 2000, Attorney Jason Dunn wrote letters periodically to Jan Wolverton, reminding him of the other requirements in the Ground Lease that had to be fulfilled by September 1, 2000 according to Clause 15.[14] In response, in June 2000, a meeting took place between Southcoast, Trust representatives, Pearle and Robert Marks. Pearle provided a progress report and gave assurances that the project was on course.[15] To that point, the Trust had raised $225,000 to date ($74,000 in donations and $151,000 in loans from the Marks) and estimated additional project costs of $270,000. They said that Stuart Marks had committed to loan another $150,000, leaving the Trust obligated to obtain $120,000. The Trust stated that Paul Pearle would continue as the project supervisor on the interior renovations once the exterior was completed. Southcoast (through Attorney Dunn) detailed the Trust’s remaining obligations under Clause 15 (proof of financing and permitting approvals) that had to be obtained and provided by September 1, 2000. In subsequent letters, dated July 25, 2000,[16] August 22, 2000,[17] and August 28, 2000,[18] Dunn advised Wolverton that Southcoast was awaiting documentation on these points from the Trust.
September 1, 2000, was the two-year anniversary of the Ground Lease. According to Clause 15(iii), the Trust was required to have in place either sufficient funds in hand or the binding commitment of a commercial lender to finance the remainder of the project. Clause 15(iv) required the Trust to have obtained all necessary permits (including zoning approvals) to complete the project. The parties met on September 11, 2000, at which time the Trust asked for a six-month extension to complete these requirements.[19] On September 13, 2000, Southcoast’s Board of Trustees approved an extension to March 1, 2001, but refused to extend the overall completion deadline of September 1, 2001.
Following the directions of its Board of Trustees, Southcoast prepared an amendment to the Ground Lease. Attorney Jason Dunn sent it to Jan Wolverton, describing it as a “simple amendment.”[20] The Amendment acknowledged that the exterior renovations were substantially completed (as required by Clause 15(i)), approved Paul Pearle as the contractor for interior renovations (required by Clause 15(ii)), and extended the time for compliance under Clause 15(iii) and (iv) until March 1,2001. Additionally, Southcoast inserted a new clause stating that time was of the essence and failure to complete all work by September 1, 2001 would be deemed a non-curable event of default, permitting Southcoast to take possession of the building.
Nancy Miller, as Trust president, was outraged when she reviewed the proposed amendment to the Ground Lease. She believed that the Trust had made enormous progress in restoring the building, had generated great community interest and pride in the project, and had been successful in raising money through community-based fundraising efforts. Southcoast’s insistence on looking ahead (by focusing on the long-term rather than short-term issues) was, in Miller’s view, unfair and unreasonable. Consequently, she refused to sign the amendment until, in January 2001, Pearle persuaded her that he would get the job done and that she need not worry about his ability to complete the project. The amendment was signed by Miller in early January 2001, effective back to September 1, 2000 and extended the date for performance under Clause 15 to March 1, 2001.
Despite letter requests and reminders from Attorney Dunn, the Trust did not provide further information until February 23, 2001. On that date, Pearle delivered a letter and other materials to Southcoast.[21] Pearle’s submission was intended to satisfy the remaining requirements of Clause 15. He disclosed (for the first time) that the Wareham School Department was interested in occupying the building.[22] He submitted a second letter from PAL Financial Corporation that said the Homestead was conditionally pre-ap-proved for a $250,000 loan, and a letter (in memo form) from the Compass Bank expressing a willingness to consider a loan to the school department.
On March 7, 2001, Southcoast (through Attorney Dunn) responded to Pearle’s submission.[23] In a five-page single spaced letter, Attorney Dunn detailed why, in Southcoast’s view, the information failed to comply with the requirements of Clause 15 of the Ground Lease. In particular, the Trust had not secured financing for the completion of the project (other than the Marks’ loan offers); they did not have funds on hand nor were the letters from PAL or Compass Bank binding commitment letters as required under the Ground Lease. As well, the Trust had not obtained site plan review from the Wareham Planning Board (necessitated by the need for more than eight parking spaces). Dunn’s letter ended with a formal notice of default and a demand that the default be cured within thirty days (as required under Clause 13 of the Ground Lease). The Trust did not formally respond to Dunn’s letter.[24]
The restoration project was frequently discussed at Southcoast Board of Trustees meetings. When a default was declared in March 2001, the Board authorized Dr. Goodspeed to forego declaring a breach and taking possession of the Homestead, opting instead for continued efforts to permit the Trust to finish the project if possible. Elaine Meredith sought to meet with the Trust and the school department and apparently was comfortable with the department’s interest in the Homestead as future office space. Pearle was similarly optimistic; in meeting with school officials he *281 incorporated interior improvements to satisfy their needs, including the design of an elevator to comply with handicap accessibility laws, and wiring to accommodate the department’s technology needs. The school department also required an increase in the size of the Homestead parking lot and it was understood that Planning Board authorization would be sought.[25]
During the spring and summer of2001, Southcoast continued to press the Trust (principally through Paul Pearle) to meet the terms of the Ground Lease and the Amendment. By letter dated June 29, 2001, Pearle provided a status report indicating that site plan review was pending before the Planning Board, that all required permits were on track, and he attached a Plymouth Savings Bank account statement showing that the Trust had $206,014 on hand.[26] Thereafter, on August 7, 2001, a status meeting between Southco-ast and the Trust occurred. With three weeks remaining for performance under the Ground Lease, Southcoast requested and the Trust agreed to provide a detailed list of renovations to be completed, a date for completion, a pro forma financial projection for the Homestead (both past and projected future costs), and particulars regarding future lease terms.[27]
On August 15, 2001, Pearle responded to Southcoast’s request by letter.[28] Noting that work continued on the second and third floor and that discussions continued with the school superintendent and possibly Compass Bank, Pearle sought an additional three-month extension to Clause 15 of the Ground Lease. This led to a further meeting where Southcoast expressed its frustration with what it perceived to be repeated lapses by the Trust in securing the future viability of the Homestead. As reflected in a summarizing letter dated August 24, 2001,[29] Southcoast (through Attorney Dunn) reviewed the history of the project, the requirements of the Ground Lease that remained unfulfilled, and their frustration with the Trust’s failure to perform within established time periods. Southcoast also questioned whether a suitable tenant could be found in order to pay the operating and carrying costs after the restoration was completed. In response to Paul Pearle’s request for a further extension of time, Dunn prepared a proposed extension agreement entitled, “Second Amendment to Ground Lease”.[30]
The Second Amendment was written by Dunn to incorporate into the Ground Lease terms the conditions Southcoast had been seeking from the Trust. To insure that the three-month extension (and no more) was firm, Southcoast changed the lease term from 99 years to 39 months, expiring on November 30, 2001. Then, if the other covenants (restoration, permitting and sub-tenancy) were fulfilled, the Ground Lease would be further amended to extend the lease for its full 99-year term. The amendment also required, inter alia, that the Trust obtain an occupancy tenant (to be approved by Southcoast) on or before November 29, 2001, and established minimum lease terms and tenant obligations. Finally, it reaffirmed that time was of the essence and that failure to perform would constitute a default.
Nancy Miller saw the draft Second Amendment when she was at the Homestead meeting with Paul Pearle on August 31, 2001. She exploded upon reviewing it, viewed it as “all false,” and stormed off without signing it. Only later that day, after Pearle pleaded with her, did Miller sign the amendment on behalf of the Trust. However, before signing, Miller spoke about it with Ben Dunham, Attorney George Decas, town selectmen, other Trust members, and Robert Marks. There was no effort by Miller or other Trust representatives to negotiate the terms of the Second Amendment.
From September 1 to November 30,2001, construction activities continued but were not completed. Interior work on the second and third floors was performed, carpeting laid throughout, interior painting completed and finishing touches were done. However, the Trust had a significant setback in September. Wayne LaGue announced that the school department would not be able to lease the Homestead for its offices. LaGue had been banking on anticipated government grant monies to fund the department’s relocation and the government had cancelled the grant. Southcoast learned that the school department tenancy was off the table through the local newspaper. In the weeks leading up to November 30, 2001, Attorney Dunn cautioned Paul Pearle that the conditions and deadlines imposed by the Second Amendment were firm and no extensions would be considered. Dunn reiterated to Pearle that under the amendment Southcoast had the right to review and approve any occupancy tenant and that sufficient time for approval had to be provided.[31]
Elaine Meredith arrived at work on the morning of November 30, 2001. She found an envelope on her desk that Paul Pearle had delivered (after hours) on November 29. Inside the envelope was a certificate of occupancy for the first floor and a conditional certificate of occupancy for the second and third floors. Also included was a purported lease between the Trust and Stuart Marks.[32] Finally, Pearle included a handwritten note stating, “We will be having an open house Friday, November 30 from 4 to 9. We will be happy to have South coast [sic] hospitals group members join us if anyone would like to.”[33]
Southcoast decided to terminate the Ground Lease pursuant to the terms of the Second Amendment. As of November 30th, Pearle had not completed the physical restoration. The building had an elevator shaft but no elevator; there was no second means of egress from the third floor finished space; the parking area had a binder coat but no final coat of asphalt, approval for a drain system had not been obtained, and exterior *282 lighting was not complete; handicap accessible railings were lacking; finish landscaping had not been provided; and touch-ups to siding, gutters and exterior painting had not been performed.[34] A leak was discovered in the front porch roof that was later repaired by Southcoast for approximately $3,800. Paul Pearle had obtained some but not all of the required municipal permits for the Homestead.
Dr. Goodspeed went to the Homestead as the open house was taking place. He commended Paul Pearle and the others on their tremendous efforts and achievement in restoring the Homestead but also advised them that due to the expiration of the lease term, Southcoast would take possession of the building as of midnight on December 1, 2001. Pearle, Miller and others were crestfallen. They scrambled to move their records (all Trust records and receipts had been stored in the Homestead) and Pearle’s tools and equipment out of the house, storing them in a dumpster.[35]
Southcoast took possession of the Homestead on December 1, 2001. Days later, Dr. Goodspeed appeared at a local selectmen’s hearing to explain what had happened.[36] He recounted (from Southcoast’s perspective) the history of the project, Southcoast’s patience with the Trust and Paul Pearle, the need to terminate the lease, and committed that given the substantial (though incomplete) restoration, the hospital would not demolish the building. Rather, Southcoast would seek a suitable tenant (including any tenant proposed by the Trust) and proposed alternative methods of providing revenue to the Trust (from the excess of rental income over operating and carrying costs) to satisfy its loan obligations and continue its preservation purposes.
Since December 2001, the Homestead has been unused and unoccupied. Efforts were made in 2001 and 2002 to secure a tenant but were unsuccessful. In one instance, shortly after Southcoast took possession, a local doctor expressed interest in relocating his practice, Wareham Pediatrics, in the Homestead. Negotiations took place between the doctor and hospital representatives over a four-month period in 2002.[37] It was estimated that build-out costs to make the building suitable for a medical practice exceeded $300,000. Southcoast obtained estimates that the cost to complete the renovations (including window replacement and elevator installation) exceeded $165,000,[38] and that a fair market rental rate after a build-out would be approximately $16/sq. ft.[39] Based on the estimates, Southcoast believed that while the rental revenue over time would likely cover the operating costs for the Homestead, there would be no additional revenue to pay to the Trust. Negotiations with the proposed tenant collapsed when Southcoast indicated it would not advance funds necessary to build out the building to suitable office space. In addition to Southcoast’s efforts, the Trust also sought out prospective tenants.[40]
The financial relationship between the Trust and the Marks evolved over time. It began after Paul Pearle met Robert Marks and learned of Stuart Marks’ interest in historic preservation and deep pockets.[41] Pearle needed funds early on in order to close the building to prevent further exposure to the elements. The Marks advanced approximately $28,000 at a time before the Trust had obtained its tax-exempt status.[42] In conversations with Southcoast representatives (Robert Gauthier and Antonio Pacheco) Pearle characterized the Marks as donors, giving money “with no strings attached.” Only later did the hospital become aware they were unsecured lenders.[43] Southcoast asked for copies of any loan documents between the Trust and the Marks and were informed that there were none.
The Trust was only slighter more familiar with the lending arrangements involving the Marks. Nancy Miller, as President, did not concern herself with the Trust’s financial accounts, leaving that to Paul Pearle and Jan Wolverton.[44] Wolverton oversaw the Trust checking account, maintaining financial information on a Quicken software program he installed on his personal computer. Wolverton would deposit monies (in cash or from checks) into the bank account and write checks when Paul Pearle requested that he do so. A later forensic audit of the Trust checking account revealed a total of $322,508 in deposits and disbursements totaling $329,368. A total of approximately $190,000 in check deposits were drawn on accounts of Stuart or Robert Marks.[45] In addition, as part of a series of deposits in June 2001, totaling $220,483.23, $30,000 in cash was deposited in amounts under $10,000 over four consecutive days.[46] Although Robert Marks acknowledged that the money came from Stuart, he could not explain why it was deposited in a structured fashion.[47] According to Robert, who maintained records on a computer program entitled, “Class Report,” he provided the Trust (through Pearle) with a total of $515,605.44, of which the Trust repaid $28,945.[48] According to Robert, the amount of the outstanding loans owed by the Trust totaled $476,660.44.
DISCUSSION
The Trust, Southcoast, and Stuart Marks seek declarations regarding the validity and viability of the Ground Lease. The Trust and Marks also seek a declaration that the sub-lease is valid and enforceable, and assert additional claims against Southcoast for intentional interference with advantageous contract relations and violations of G.L.c. 93A. The Court will address each category of claims in turn.
Validity of the Ground Lease and Amendments
The starting point, and one on which all parties agree, is that the respective rights of the parties derive from the Ground Lease entered into between Southco-ast and the Trust on September 1, 1998. The Ground Lease, as a form of contract, is enforceable according to its plain terms. Liberty Mutual Insurance Co. v. *283 Gibbs, 773 F.2d 15 (1st Cir. 1985). However, as with any contract, the Ground Lease was subject to modification or amendment by agreement of the parties to it. Vakil v. Anesthesiology Associates of Taunton, 51 Mass.App.Ct. 114, 120 (2001). A material breach occurs where there is a failure to perform an obligation which is an essential and inducing feature of the contract. Bucholz v. Green Brothers Company, 272 Mass. 49 (1930).
The Ground Lease is enforceable as a proper contract, according to its plain and unambiguous terms. The evidence presented at trial demonstrates that it was fully and fairly negotiated between sophisticated parties and was the subject of numerous proposals and counterproposals. Both sides had able assistance of counsel during their negotiations; Southcoast was represented by attorneys from Ropes and Gray while the Trust had involvement from Attorney George Decas and Attorney Jan Wolverton. There is no basis upon which to conclude that the parties were not on equal footing during their discussions leading to the creation of the Ground Lease.
Southcoast’s purpose in entering into the Ground Lease was consistently stated and clear: to permit restoration and preservation of the Homestead so long as it could occur within an established time frame at no cost to the hospital and, if not, to permit its demolition. These terms were articulated in Southcoast’s complaint for deviation filed in the Probate Court, and approved by that court prior to execution of the Ground Lease.
The Trust (and Marks) contend that Southcoast’s termination of the lease at the end of November 2001 was invalid because it was based on the terms of the first and Second Amendments, both of which were void and unenforceable. First, they claim that the amendments, which altered the time for compliance and imposed a requirement for a sublease, violated the terms of the Probate Court Judgment which granted Southcoast the right to deviate from the will of Alice Tobey Jones and enter into the lease. According to the Judgment (Trial Exhibit 59), the probate court approved the terms of the Ground Lease “with reasonable, immaterial modifications as may be agreed to during final negotiations . . The Trust asserts that because the amendments included material changes, they exceeded the scope of authority granted by the probate court and cannot serve as a grounds for termination of the Ground Lease.
Ordinarily, claims related to the administration of a public charity are vested in the Attorney General. G.L.c. 12, §8; Weaver v. Wood, 425 270, 275 (1997), cert. denied, 522 U.S. 1049 (1998). However, a person asserting a special interest in the public charity may have standing as an interested party. Trustees of Dartmouth College v. Quincy, 331 Mass. 219 (1954). Assuming, arguendo, that the Trust has standing to challenge the validity of the amendments in the absence of probate court approval, the claim is nonetheless unavailing. The amendments are not inconsistent with the scope of authority granted to Southcoast through its complaint for deviation. The complaint detailed the history of the Homestead structure and its incompatibility with the hospital’s health care mission. It detailed the hospital’s negotiations with community activists leading to the creation of the Trust and the drafting of the Ground Lease. It made clear that the Ground Lease required restoration of the Homestead within a three-year (and one three-month extension) period and that Southcoast would be authorized to demolish the Homestead entirely if the Ground Lease terminated. The specific performance requirements under Clause 15 of the Ground Lease were separately listed in the complaint. The Judgment issued by the Probate Court mirrored the claims for deviation contained in Southcoast’s complaint.
The changes to the terms of the Ground Lease by each amendment, while material as between Southco-ast and the Trust, did not materially alter the scope of deviation granted by the probate court. As to the September 2000, amendment, both parties were still subject to the covenants of the Ground Lease, except that the Trust was permitted six additional months to comply with its obligation to secure financing and obtain the requisite permits. The addition of a “time is of the essence clause” did not materially alter the obligations of the parties under the Ground Lease. Rather it made explicit what was already implicit in the original Ground Lease; that there were performance deadlines that extended to but did not exceed a three-year window for performance.
The Second Amendment similarly varied some of the terms but not the essential purpose of the Ground Lease. It retained the Trust’s right to a 99-year lease at an agreed upon rate of $1 per year but restructured the Ground Lease into two components: a three-year, three-month lease (terminating on November 30, 2001), with an automatic extension for the full 99-year term in the event the Trust complied with its other obligations. In this regard, it did not vary from the permitted authorization of the probate court.
One material change in the Second Amendment was the requirement for the Trust to obtain an acceptable occupancy tenant at a prescribed rent and for a minimum seven-year term. There was nothing in the Ground Lease executed in 1998, nor in the September 2000, amendment, that required the Trust to have a long-term tenant. As originally agreed to, the Trust retained the right to use the Homestead for a variety of permitted uses, or even to leave it vacant.
The Trust asserts that the requirement for an occupancy tenant, inserted into the Second Amendment, is unenforceable because it was forced on the Trust under economic duress. A contract (or provision) may be deemed as non-binding when it is the product of coercion. International Underwater Contractors, Inc. v. *284 New England Tel & Tel Co., 8 Mass.App.Ct. 969, 970 (1979). To prove economic duress, a party must show that they involuntarily accepted the terms of another; that the circumstances permitted no other alternative; and that the circumstances were the result of coercive acts of the opposite party. Id.; Urban Plumbing & Heating Co. v. United States, 480 F.2d 382, 389 (1969), cert. denied, 398 U.S. 958 (1970). “The assertion of duress must be proved by evidence that the duress resulted from defendant’s wrongful and oppressive conduct and not by plaintiffs necessities.” W.R. Grimshaw Co. v. Nevil C. Withrow Co., 248 F.2d 896, 904 (8th Cir. 1957).
The determination whether one party capitalized on another’s financial circumstances to extract a benefit which otherwise would not have been due is a fact-dependent determination, based on the relationship between the parties, the history of their contractual interaction, and the circumstances leading to and surrounding the disputed provision. Here, the requirement for a tenancy arose out of the repeated difficulties the Trust had in funding the restoration project and its failure to provide for future operating and carrying costs. Southcoast made clear from the beginning of its discussions with Trust representatives that it did not have thé financial wherewithal to maintain the Homestead. Its willingness to permit a restoration was based on the Trust’s commitment to assume financial responsibility for the structure, both during the restoration process and thereafter. The Ground Lease imposed on the Trust a duty to pay all taxes, assessments, utilities, maintenance and improvement costs, and insurance.
Over the three-year restoration period, Southcoast (through Attorney Dunn) repeatedly sought information and assurances that the Trust would be capable of fulfilling its long-term financial obligations. Their requests were frequently met with silence or incomplete financial disclosures. Through the summer and into the fall of 2001, Pearle represented that he had obtained enough money to complete the renovations, but nothing more. Given the Trust’s tortured history of financing the restoration it was neither unreasonable nor coercive for the Trust to seek assurances through the Second Amendment for an occupancy tenant which would ensure that the Homestead remained financially viable. The Trust assented to the tenancy provision in the Second Amendment as well as its other terms, when Nancy Miller (as president) and Robert Marks (as treasurer) signed the agreement. Significantly, no objection was voiced at the time the draft amendment was sent to the Trust and no changes were sought. Under these circumstances, Southcoast’s demand that the Trust obtain a tenant, as a condition of their extending the date for performance, was neither unreasonable nor oppressive.
Moreover, the Trust is estopped from asserting that the two amendments are void based on the fact that they received the benefits afforded by each. A party that has consented to a deviation from a contract cannot later claim a breach based on the deviation. Cueroni v. Boburnville Garage, Inc., 315 Mass. 135, 139 (1943). The first Amendment provided the Trust a means of avoiding a notice of default in September 2000, when it failed to comply with all the requirements of Clause 15. It gave the Trust an additional six months to fulfill its obligations and provide the requisite proof that the project could be completed on time. When the September 2001 deadline (set by the Ground Lease) approached, the Trust benefitted again by the Second Amendment, which gave another three months (a time period suggested by Pearle) to complete the restoration and have a secure plan for the future.
The law will not permit a party to receive the benefits of a contract while holding in reserve a claim that its obligations are invalid or onerous. Yet this is exactly the argument underlying the Trust’s claim that the amendments are void as outside the permitted deviation from the Probate Court. Indeed, taking the Trust’s argument to its logical conclusion, Southcoast would have been compelled by the probate court decree to declare a default in September 2000, when the Trust failed to meet its obligations under Clause 15 (subject to a thirty-day right to cure). The Ground Lease would have automatically terminated when the default was not remedied, and all of the events that subsequently occurred would have been outside of the lease agreement between the parties. Such a result is neither warranted nor compelled under the law.
Next, the Trust contends that Southcoast induced it to agree to the first Amendment by misrepresentation. The basis for the claim is found in a single phrase contained in a cover letter from Attorney Jason Dunn to Jan Wolverton (Trial Exhibit 16). The letter, dated September 22, 2000, reported on a review of the Homestead progress by Southcoast’s Board of Trustees and their willingness to extend the time period for compliance with the Clause 15 conditions from September 1, 2000 to March 1, 2001. Dunn wrote that an extension could be accomplished by executing “a simple amendment to the Ground Lease ...”
Misrepresentation involves knowingly making a false statement of a material matter, intending that the other party rely on the statement, and upon which the other party relied to their detriment. Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991). The statement at issue must be “one of fact, not of expectation, estimate, opinion, or judgment.” Powell v. Rasmussen, 355 Mass. 117, 188 (1969). Dunn’s characterization of the September 2000, amendment as “simple” was more of an expression of opinion than a statement of fact. Nonetheless, an argument could be made that someone could have been misled by the characterization and lulled into accepting the amendment without examination. However, such was not the case here. Consistent with her stated view that she wouldn’t *285 believe anything the hospital said, Nancy Miller received and reviewed the amendment and railed against it, refusing to sign it for four months until persuaded by Paul Pearle. The evidence does not support the claim that the Trust relied on Dunn’s statement; to the contrary it shows the opposite.
Third, the Trust claims that the amendments were prepared in violation of Southcoast’s obligation to act in good faith in order to extort further rights from the Trust by exploiting their economic straits. This claim, similar to but legally distinct from the Trust’s economic duress argument, is similarly unavailing because the facts do not support it. “Every contract implies good faith and fair dealing between the parties to it.” Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990) (citations omitted). The implied covenant of good faith and fair dealing provides “that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract ...” Drucker v. Roland Wm. Jutras Associates, 370 Mass 383, 385 (1976). Where a party to a contract uses their discretionary rights as a pretext to extract more benefits or concessions than they are entitled to under the contract, a breach of the covenant of good faith may be found. See Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 473 (1991) (violation of implied covenant of good faith where party uses its discretionary authority for the illicit purpose of extracting price concessions or greater bargaining position). If proved, a breach of the covenant of good faith supports liability under c. 93A. Id. at 475.
Viewed in the context of the entire history and circumstances surrounding the Trust’s performance under the Ground Lease, the facts do not show that Southcoast sought to take advantage of the Trust by extracting greater rights than it had under the Ground Lease. The insertion of new conditions in the two amendments to the Ground Lease arose from the Trust’s failure to perform according to the requirements of the Ground Lease. In September 2002, the Trust had failed to fulfill all of the requirements of Clause 15. A breach could have been declared at that point but Southcoast instead acceded to the Trust’s request for more time. When performance had not occurred as the three-year end date approached in September 2001, Southcoast again acceded to the Trust’s request for another extension, notwithstanding that a notice of breach had been issued in March 2001.
The amendments altered the terms of the initial Ground Lease but they did not do so unfairly. During the three-year period that the Ground Lease was in effect, the Trust focused almost exclusively on the physical restoration of the Homestead (and hosting fundraisers to finance the restoration) but ignored other aspects of the Ground Lease. For the most part, they delegated to Paul Pearle responsibility for the project, including obtaining funds from the Marks brothers. Seemingly, the Trust’s attitude was that if enough progress was made on restoration, everything else would just fall into place and Southcoast would recognize the significance of the finished product and relent on the other requirements. This approach was fostered by the Trust’s efforts to engender community involvement and support. The trial evidence includes dozens of letters from Attorney Dunn to Trust members or representatives (including Pearle) reminding them of performance requirements under the Ground Lease and matters that had not yet been fulfilled. The importance of a plan for the Homestead’s short and long-term financial stability was an essential ingredient of the lease agreement. When the Trust was unable to secure either preservation grant funds or funding through a commercial lender, and relied instead almost entirely on unsecured loans, Southcoast’s concern about the Trust’s ability to repay those loans was justified. It seemed temporarily solved when the Wareham School Department was a potential tenant (combined with a Compass Bank loan) but went into a state of uncertainty after the school system backed out. Moreover, the insertion in the Second Amendment of an occupancy lease was not obj ected to by the Trust. To the contrary, they took the benefit of the extension of time without attempting to negotiate the other terms of the amendment.
The Trust further contends that Southcoast breached its covenant of good faith by refusing to enter into a preservation restriction. According to Miller, the Trust contemplated funding the restoration in part, through preservation grants but were rejected by the state based on the terms of the Ground Lease. Clause 24, entitled “Conditions to Effectiveness of Lease” provided Southco-ast with a right to raze the Homestead in the event of a termination of the lease. Because Southcoast refused to enter into a preservation restriction, the grant request was rejected. Accepting the argument that a grant would have been obtained but for Southcoast’s insistence on a residual right to demolish, their inflexibilify does not constitute bad faith. Southcoast’s reserved right of demolition was an essential component of the overall plan to deal with the homestead issue. It provided the hospital with an assurance that the Homestead would not continue as a long-term liability in the event the Trust’s efforts were not successful. There is no evidence (nor can there be on the facts here) that the Trust was caught unawares by Southcoast’s position regarding its reserved right which was the subject of negotiation and proceedings before the Wareham Historical Commission which issued the conditional certificate of hardship.
Similarly, the Trust asserts that Southcoast’s conduct prevented them from obtaining conventional financing. Under the Ground Lease, Southcoast had various approval and first refusal rights. Clause 9 (Assignments, Subleases of Tenant’s Interest), provided that the Trust could not enter into a sublease without Southcoast’s prior written consent, “which consent shall *286 not be unreasonably withheld.”[49] Any sub-lease without prior consent would be void. Under Clause 10 (Leasehold Mortgages), Southcoast was required to “reasonably cooperate with [the Trust] in amending the terms and provisions of this Lease ... as is reasonably necessary to enhance [the Trust’s] ability to secure one Institutional Leasehold Mortgage, provided however, such amendment or alteration of this Lease shall not in any material way adversely affect any right of Landlord under this Lease. Under Clause 17 (Landlord’s Right of First Refusal), Southcoast had a right of first refusal in the event the Trust negotiated a transfer of its interest under the lease. The right of first refusal was applicable to any subsequent possessors.
Although there was anecdotal evidence (from Nancy Miller and through deposition testimony of Paul Pearle) that the Trust sought funding from a number of commercial lenders, the only documented proof consists of inquiries to two lenders, PAL Funding and Compass Bank. PAL Funding issued two so-called pre-commitment letters but no evidence has been presented showing that any provision of the Ground Lease hindered the issuance of a commercial loan from PAL Funding, nor that any waiver of Southcoast’s rights was sought in connection with loans from PAL Funding.
Compass Bank became involved in the Homestead as a result of the Wareham School Department’s interest in a sublease. Compass Bank issued a commitment letter to the Trust on April 18,2001 (Trial Exhibit 110) for a construction loan in the amount of $220,000. However, the bank’s agreement was conditioned on a sublease to the school department which never came to fruition.[50] Moreover, after Wayne LaGue announced that the school department would not enter into a lease, Paul Pearle apparently continued discussions with the Compass Bank and communicated with Southcoast, stating that the bank would not issue a loan unless Southcoast waived its right of first refusal. In response, Attorney Dunn wrote to Pearle on October 17,2001 (Trial Exhibit 22), outlining a proposal where Southcoast would agree to a limited waiver of its right to Compass under certain conditions. No evidence was presented as to whether Dunn’s proposal was forwarded to or considered by the bank.
To the extent the Trust contents that Southcoast acted in bad faith by the mere fact that they refused to relinquish the right of first refusal, the argument must fail. The right of first refusal was negotiated as part of the initial Ground Lease and constituted a material term of the lease. It is not unlawful on its face nor does it offend public policy so as to render it an unenforceable component of the lease contract. The fact that Southcoast sought to protect its interest in the right by refusing to waive or subordinate it cannot, without more, prove bad faith. By the same token, Southcoast’s October 2001, offer of an alternative to permit the Compass Bank loan is consistent with its obligation, under Clause 10, to reasonably cooperate with the Trust to permit commercial financing. There is no evidence before the Court as to whether this alternative was presented to or considered by the bank.
Lastly, the Trust and Marks assert that Southcoast engaged in bad faith throughout the proj ect because they never intended that the Trust would receive the full benefit of the Ground Lease. Citing to the hospital’s neglect of the Homestead following the 1985 fire and its failed attemptto obtain a demolition permit in the 1990s, the Trust argues that Southcoast structured the lease terms so they would fail, that the lease agreement was only an artifice used to obtain a conditional certificate of hardship which would be acted upon when the Homestead wasn’t completed on time. Says the Trust, Southcoast changed tack in 2000 when it became apparent that Paul Pearle would succeed in restoring the structure. Southcoast then engineered the amendments to the Ground Lease to impose further barriers for the Trust so that Southcoast could reclaim the building and profit from it themselves. Supporting the latter argument was Southcoast’s negotiations to lease the Homestead to one of its own doctors (at a claimed less-than-market rate). On consideration of all the exhibits and assessing the credibility and testimony of the parties’ representative officers and agents, the Court does not accept the Trust’s claim.
Likewise, the Court does not find, as argued by Southcoast and the Attorney General, that there was a hidden agenda by Paul Pearle and the Marks brothers to assume the Ground Lease and profit from the Homestead into the future. While there is some record evidence that could suggest such a plan (writings between Pearle and Robert Marks, references to an assignment of the Ground Lease to SRP Associates, and proposals submitted on doctored stationary), the Court views such evidence as no more than attempts by Paul Pearle to buy time in order to complete the restoration to do whatever was necessary to make the project appear viable to Southcoast. Although Pearle’s conduct in this regard was wrongful, it was not part of some nefarious plan to wrest possession of the finished structure from the Trust. Pearle’s motivation and purpose was in preserving the grand old structure and not to profit from it.[51]
Weighing all of the evidence and on the facts as found by the Court, there is no reason why the terms of the Ground Lease, as amended, are not binding on the parties. Therefore, finding that the Ground Lease (as amended) was valid and enforceable, Southcoast was entitled to terminate the lease and take possession of the Homestead according to the provisions of the Second Amendment. It is beyond dispute that the Trust had not complied with its obligations under the lease terms, and their failure was, according to the Second Amendment, non-curable grounds for default and termination.
Moreover, because this Court rules that the lease terms were breached by the Trust, resulting in a termination of the lease on November 30, 2001, and *287 that Southcoast did not violate an implied covenant of good faith and fair dealing, the Trust and Marks’ respective claims under G.L.c. 93A, §11 must fail. For the same reasons, those claims asserting interference by Southcoast with advantageous contractual relations also cannot stand. See U.S. Trucking Corp. v. Geltman, 406 Mass. 811, 812-16 (1991) (claimed interference must not only be intentional but improper, either through improper motives or improper means).
Validity of the Sub-Lease to Stuart Marks
The sub-lease from the Trust to Stuart Marks was a contrivance. It was prepared and executed on November 29, 2001, for the sole purpose of satisfying the requirement that an occupancy tenant be secured before November 30. Marks (at trial) and Paul Pearle (through deposition) acknowledged that there was no actual expectation that Marks would occupy or use the Homestead for any purpose, rather the sub-lease was prepared because it was the only way to avoid a termination of the Ground Lease and secure Marks’ investment.
The Second Amendment reserved to Southcoast the right to approve the sub-lease. It required Southcoast to promptly consider and respond to any submission, “provided that the Tenant shall have provided the Landlord with complete and accurate information upon which a decision may be made.”[52] In letters to Pearle from September through November 2001, Jason Dunn reminded Pearle that any sub-lease had to be provided to Southcoast sufficiently in advance of November 30 to permit a review. Pearle’s submission on the eve of the expiration of the Ground Lease, absent any information about Marks’ intended use, did not satisfy the requirements of the Second Amendment and therefore is not enforceable as against Southcoast.[53]
Validity of Marks’ Loans
In Count I of Stuart Marks’ first amended complaint, Marks asserts a claim against the Trust for monies owed as a result of the loans he advanced, together with interest. Although the complaint alleged a principal loan amount of $563,462.97, the amount of the claim was reduced through trial to $476,660.44.
The Trust (through Nancy Miller as president) admits that it received monies from Stuart Marks (through his brother) and that there was an expectation that they would be paid back. The only party challenging the existence of the debt is the Attorney General, as an intervener pursuant to her duties to protect the public interest in charitable organizations under G.L.c. 12, §8 et seq. The Attorney General (and Southcoast) asserts that any monies advanced by Marks do not constitute enforceable loans because they are undocumented, are devoid of terms for repayment or interest, and were not known to Trust representatives or Southcoast until sometime in 2002.
“An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms.” Targus Group International v. Sherman, 76 Mass.App.Ct. 421, 428 (2010), see also McCarthy v. Tobin, 429 Mass. 84, 87 (1999). The agreement is legally recognized so long as the terms are set out “with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.” George E. Wilcox, Inc. v. Shell E. Petroleum Products, 233 Mass. 383, 388 (1933). “It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract.” Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000).
Here, there was an agreement that monies advanced by Marks to Pearle would be paid back. Pearle, Miller, and both Marks acknowledge as much, and characterized the Marks’ provision of money as unsecured loans in meetings and correspondence with Southcoast. The agreement, and debt for the principal amount loaned, is not unenforceable merely because other terms remained indefinite.[54] What is uncertain is the due date for repayment. However, “(I]n instances of ambiguity, a court may furnish a time element reasonable in the circumstances of the parties’ dealings.” Targus Group International v. Sherman, 76 Mass.App.Ct. at 431, citing Middleborough v. Middleborough Gas & Electric Dept., 47 Mass.App.Ct. 655, 658-59 (1999).
A reasonable time for repayment can be determined by reference to the sub-lease. Although unenforceable against Southcoast, the sub-lease demonstrated an understanding that Stuart Marks would pay a $6,600 monthly rent for a seven-year period, totaling $554,400. Since the Trust’s principal indebtedness was to Marks, forgiveness of monthly rent by the Trust would, over the course of seven years, roughly equal the amount of money owed to Marks.[55] It is reasonable to infer that the parties intended that Marks would have been repaid out of rental revenues, the Trust having no other financial resources. Therefore, using the monthly rent formula established in the sub-lease, a reasonable end date for repayment would be six years and two weeks from the date of judgment.
The Court does not accept Marks’ claim for interest on the money owed (other than statutory interest applied to the judgment). There was no evidence presented at trial showing that the parties ever discussed an interest rate, or how interest was to be calculated. Monies were advanced to the Trust essentially in the form of a line of credit, Robert Marks writing checks or providing cash to Paul Pearle as bills came due or the payroll had to be met. There is too much ambiguity in the formulation of an interest calculation (whether it should be flat or compound, fixed or adjustable) and, where the Marks chose not to negotiate an agreement on interest, this Court declines to make up for their omission.
Attorney General Claims
The Attorney General seeks declaration through its intervener complaint that Robert Marks and Nancy *288 Miller breached their fiduciary obligations to the Trust and should be removed as officers of the charitable trust. As to Marks, the Attorney General cites to Marks’ dual roles as an agent and attorney for his brother (an unsecured creditor) and as clerk and treasurer of the Trust following Attorney Jan Wolverton’s resignation. Based on his divided duties of loyalty,' his failure to disclose material facts about his brother’s loans, and his involvement in securing a sub-lease for his brother’s benefit (to secure repayment of loans), he breached his fiduciary obligations owed to the Trust and should be removed as an officer. The Court need not dwell on these claims because since the institution of litigation, Robert Marks resigned from his position with the Trust and has no further relationship to it.
Nancy Miller was at all times pertinent hereto, President of the Trust. As such, she owed a duty “of complete good faith plus the exercise of reasonable intelligence.” Murphy v. Hanlon, 322 Mass. 683, 684 (1948). The Attorney General asserts that Miller breached her duly of care by distancing herself entirely from the financial relationship between the Trust and the Marks brothers, delegating to Paul Pearle all responsibility for obtaining monies from the Marks. A breach of a fiduciary’s duty is not established by mere errors of judgment or want of prudence in the performance of their duties. See Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass. 434, 436 (1935). However, here the evidence demonstrates Miller’s conduct was more than simple inattention. It rises to the level of willful blindness, the deliberate avoidance of information material to the Trust’s interests. Although Miller testified (at one point in the trial) that Paul Pearle was not authorized to enter into loan arrangements involving the Trust and that she had instructed him not to do so, the evidence is undisputed that Pearle regularly and repeatedly went to Robert Marks seeking more money from his brother. What began as relatively small monetary advances evolved into transfers of tens of thousands of dollars and culminated in a June 2001, series of deposits totaling over $200,000. As presiding officer of the charitable trust, Miller’s duty of good faith and reasonable intelligence required that she exercise reasonable diligence in determining the source of the funds, the conditions under which they were given, and the Trust’s obligations with regard to repayment. As to these particulars, Miller demonstrated a remarkable lack of curiosity. No loan documents were ever prepared, critical terms went undefined, no rate of interest was ever explored (much less agreed upon), and the Trust was left with an uncertain financial obligation.
Miller also permitted Paul Pearle to enter into the purported sub-lease in November 2001, and to submit the sub-lease to Southcoast as a means of avoiding a default and termination on November 30,2001. There is no evidence that Pearle had been formally authorized to sign the sub-lease but Miller adopted it as a binding agreement between the Trust and Stuart Marks. To the-extent Miller was aware of the sub-lease before it was submitted to Southcoast, she breached a duty of reasonable diligence by failing to ensure that it was valid (not a mere contrivance) and in the Trust’s best interest. If she permitted it to be executed and submitted to Southcoast without any review, she exposed the Trust to potentially adverse consequences by complete inattention.
From all the evidence adduced at trial it is clear that Nancy Miller was not best suited to act as president of the Trust. She acted with the best of intentions and had a sincere and deep commitment to the cause of preserving Wareham’s historic architectural treasures. She worked tirelessly on behalf of the Trust in arranging community bake sales, psychic fairs, raffles and the like, and justly shared in the pride due when the building was put back on its feet, a feat described by Dr. Goodspeed to the Wareham Board of Selectmen as “a miracle.” (Trial Exhibit 56.) However, Miller’s commitment and enthusiasm cannot substitute for the duty of care required of a corporate officer. In that capacity, she failed and must be removed.
DECLARATIONS AND ORDER
Based on the findings and rulings set forth above, the Court DECLARES that the Ground Lease between Southcoast Hospitals Group, Inc. and the Tobey Homestead Restoration Trust, as amended, terminated on November 30, 2001. Southcoast Hospitals Group, Inc., lawfully took possession of the Tobey Homestead on December 1, 2001. Judgment shall enter in favor of Southcoast Hospitals Group, Inc., on Count II of Civil No. 2002-01284, Count I of Civil No. 2002-01554, and Count I of counterclaims in said action by Tobey Homestead Restoration Trust and Stuart E. Marks.
The Court further DECLARES that the Sub-lease between Tobey Homestead Restoration Trust and Stuart E. Marks is void. Said declaration applies to Count III of Civil No. 2002-01284, and Count II of counterclaims by Tobey Homestead Restoration Trust and Stuart E. Marks in Civil No. 2002-01554.
Judgment shall enter in favor of Southcoast Hospitals Group, Inc., on Counts IV, V, and VI of Civil No. 2002-01284 and Counts III, IV, and V of Civil No. 2003-00519.
Counts I and II of Civil No. 2003-00519 are dismissed as agreed to by the parties at the commencement of trial.
Judgment shall enter in favor of Stuart E. Marks on Count I of Civil No. 2002-1284 (as against Tobey Homestead Restoration Trust) in the amount of $476,660.44. Statutory interest from the date of filing shall be computed by the clerk of court.

Southcoast’s suit was initially filed in the Land Court as Misc. No. 280624 and transferred to the Superior Court by *289 administrative directive of the Chief Justice for Administration and Management on November 26, 2002.

Southcoast Hospital Group was a subsidiary of a parent corporation named Southcoast Health Systems, Inc. There were between seven and eight other subsidiaries involved in various health-care related enterprises.

Southcoast obtained a certificate of hardship on August 17, 1998. Trial Exhibit 51. It permitted the hospital to raze the Homestead in the event the building was not restored by the Trust.

Irial Exhibit 1.

The Ground Lease was drafted by Southcoast but was extensively negotiated with the Trust. When asked at trial if she had read and understood the lease terms, Nancy Miller responded, “Oh yes, don’t think I trusted them [the hospital] for a minute.” Miller’s distrust was based on her view that the hospital had disregarded its obligation under the Alice Tobey Jones’ will to preserve the Homestead by permitting it to deteriorate since the 1985 fire. According to Miller, the hospital had been engaged in a policy of “demolition by neglect.”

Clause 6 of the Ground Lease required that any proposed use of the premises after restoration had to be approved by Southcoast within parameters for permitted and prohibited uses.

The Trust contends that Southcoast concealed the extent of decay and denied the Trust an opportunity to inspect the Homestead. The claim is not supported by the evidence. The condition of the building and the fact that it had been open to the elements since the 1985 fire are clear to anyone passing the hospital. Southcoast had disclosed the extent of damage when it previously sought a certificate of hardship from the town’s Historic District Commission. Indeed one of the reasons for seeking authorization to raze the building was the high cost of renovations. Given the overlap of membership between those involved with the Historic Commission and the Trust, there is no merit to the claim that Southcoast tried to hide the true cost of renovation. Indeed, during negotiations over terms of the Ground Lease, when Nancy Miller stated that the Trust estimated repair costs of between $150-200,000, Southcoast challenged the figure, stating that the costs would likely be higher. On the evidence presented at trial, including an assessment of the witnesses involved, I find that the Trust (most notably, Miller and Pearle), blinded by the opportunity to preserve the Homestead, simply chose to ignore Southcoast’s cautionary warnings and low-balled their estimate of the scope of work.

Trial Exhibit 103.

Stuart Marks testified that he was not aware or a part of SRP Associates, notwithstanding the assertions in the October 1998, restoration proposal that Pearle submitted to Southcoast (signed by Robert Marks). Similarly, when shown Trial Exhibit 117, a letter proposal from S.E.M. Associates to the Trust dated December 17, 1999, Marks denounced it as “entirely false.” In deposition testimony introduced at trial, Paul Pearle also stated that the S.E.M. Associates letter was a fiction. See, Trial Exhibit 108, Vol. I, pp. 57-60. Pearle testified that the letter was written by Robert Marks in order to “pacify” the hospital. Id. at p. 60.

After the Trust accepted SRP’s proposal, Pearle made a presentation to Southcoast representatives on November 23, 1998, explaining the scope of exterior renovation work and manner in which it would occur. Following the presentation, Southcoast (through their attorney, Jason Dunn) wrote to the Trust giving the green light for work to commence but cautioned that any assignment of the Ground Lease to SRP would require Southcoast’s approval. See Trial Exhibit 8.

The largest single contributor was a local businessman named Chris Makepeace, who donated $40,000 from a family foundation but the check was held up until the tax-exempt status was approved by the IRS in 1999.

The Trust requested, and Southcoast provided, a letter of support for the project addressed to the Secretary of State (as grant administrator), see Trial Exhibit 52, but Southcoast was not willing to forego its rights under the Ground Lease.

Trial Exhibits 9-11.

The Trust presentation was memorialized in a letter dated July 6, 2000, from Dunn to Wolverton. Trial Exhibit 12. The content of the letter was not challenged at trial and therefore the Court finds it to be an accurate summary of the information provided and representations made by the Trust and SRP.

Trial Exhibit 13.

Trial Exhibit 14.

Trial Exhibit 15.

Either at or after the September 11, 2000 meeting, Pearle provided Southcoast with a packet of documents relating to the project’s financials. See Trial Exhibit 53. The materials included Pearle’s projection of costs and letters from Robert and Stuart Marks which referenced that Stuart had already advanced $209,770 and was willing to commit another $200,000 to the project. Robert Marks disclosed that Stuart provided (or committed to provide) money with the understanding that he would be repaid with interest once the building was occupied and had an income stream. Marks also stated that the loans were unsecured so as not to interfere with the Trust’s abiliiy to secure conventional financing. Pearle also included in the submitted materials a purported loan commitment for $500,000 from PAL Financial Corporation, a mortgage broker.

Trial Exhibit 16.

Trial Exhibit 55.

Wayne LaGue, school superintendent, was intrigued by the restoration project and had incorporated a local history segment into the school curriculum. The school department arranged for class field trips to the Homestead where Pearle taught about the history of the Tobey family and home and explained the process of restoration.

Trial Exhibit 17.

Within the thirty-day “cure period,” Paul Pearle sent a letter to Southcoast expressing his optimism that construction was proceeding on schedule and would easily be completed by the September 1, 2001 deadline. He also financial cost and loan documents and correspondence with Compass Bank. See Trial Exhibit 62.

Enlargement of the parking lot also required a change in the drainage system that intruded into a protected wetlands zone, necessitating approval from the Wareham Conservation Commission. The Trust never obtained the required wetlands authorization.

Trial Exhibit 18.

These requirements were set forth in a letter from Attorney Dunn to Paul Pearle. See Trial Exhibit 19.

Trial Exhibit 20.

Trial Exhibit 20.

Trial Exhibit 3.

Trial Exhibits 22-24.

Southcoast executives reviewed the sub-lease provided by Pearle and did not credit it as complying with the terms of the Second Amendment. Stuart Marks was a practicing dentist in Woodmere, New York. There was no representation that he intended to relocate his practice to Wareham or otherwise make use of the Homestead for offices. Rather, Southcoast perceived the sub-lease with Marks as an attempt by Paul Pearle and the Marks brothers to buy time under the Ground *290 Lease by submitting a binding lease agreement within the time limit imposed by the Second Amendment but with the intention that Stuart Marks would further sub-let the premises to a different occupant. Southcoast’s suspicions were correct. Stuart Marks testified at trial that he had no intention of occupying the Homestead. He signed the sub-lease on November 29, 2001 because his brother, Robert, told him it was the only way to protect their investment.

Trial Exhibit 25.

Southcoast later questioned the quality of the windows. Pearle had reinstalled all of the original period windows in the Homestead. On inspection, some were found to lack glazing or were deemed unsuitable. Southcoast obtained a proposal to replace 78 windows in the Homestead at an estimated cost of over $35,000.

Apparently by sheer bad timing, the dumpster was hauled away before Pearle had the chance to retrieve its contents and all of the records and receipts for the renovation work were destroyed.

Goodspeed’s written statement to the selectmen was received as Trial Exhibit 56.

Trial Exhibit 41.

Trial Exhibit 40.

Trial Exhibit 42.

Trial Exhibit 70.

Pearle first met Robert Marks when he sought bank loans on other projects and Marks was the bank’s closing attorney. Thereafter, Marks represented Pearle on an unrelated project and hired Pearle to renovate another property that Marks was involved in developing.

In April 1999, after the Trust received a $40,000 donation from the Makepeace Foundation, Pearle instructed Jan Wolverton (who maintained the Trust checkbook) to issue a check to “CEM Associates” for $28,945. See Trial Exhibits 83, 99. The check was deposited into a Marks-controlled account and constituted a repayment of monies loaned to the Trust.

Trial Exhibit 53, a packet of materials given to Southco-ast from Paul Pearle on September 11, 2000, included a letter from Robert Marks explaining the financing provided by he and his brother. The packet also included a listing of estimated costs for the total project totaling $460,350, of which $74,500 had already been paid to suppliers and contractors.

Miller’s testimony regarding the loan arrangements between the Trust and the Marks was inconsistent and unclear. She acknowledged that the Marks’ contributions came through Paul Pearle but stated that Pearle was not authorized by the Trust to borrow money. Nonetheless, she described the monies advanced by the Marks as “loans” and testified that there was an understanding that they would be paid back with interest. Miller also acknowledged that when Jan Wolverton resigned as an officer of the Trust in April 2001, he expressed reservations about the Trust designating Robert Marks as Wolverton’s successor and as trust treasurer based on Mark’s role as the project developer (part of SRP Associates) and as an agent of the principal lender. When Wolverton suggested that the Trust (or Marks) disclose Marks’ conflict to the Attorney General’s office because the Trust was a non-profit corporation, Miller disregarded the concern, stating that there was no one better to protect Stuart’s interests than his own brother.

In most cases, monies came from a Foxboro Freedom Savings Bank account entitled, SEM Associates. Robert Marks was the signatory on the account. According to both brothers, the SEM account was used for their loan ventures.

Trial Exhibit 96.

The structured deposit of $30,000 in cash was only one of many unusual financial practices by the brothers. According to Stuart, he funded loans to the Trust (and others) from cash that he had stored in his basement, monies borrowed from friends, or cash advances from his credit cards. Stuart would send money to Robert by UPS or Federal Express but never insured the shipments nor created a record of the amount. In June 2001, when Robert needed over $200,000 to show that the Trust had a cash balance, Stuart met him at a restaurant parking lot in Connecticut and provided the funds in a shopping bag. The June 2001, monies were requested by Paul Pearle in order to show Southcoast that the Trust had sufficient funds on hand to finish the project. To induce the Marks to advance monies on this occasion, Pearle faxed a handwritten letter to Robert Marks, Trial Exhibit 123, asking that Marks ‘Temporarily have SEM supply the $220,000 to show we are able to complete by Sept. 1.” Peale assured Robert that the money would not be at risk because Robert would be the sole signatory on the bank account, with “complete control ... to protect the funds.” No records or receipts were maintained by either of the Marks insofar as loans to the Trust were concerned.

Robert Mark’s total calculations were somewhat convoluted because of the manner in which monies were advanced or repaid. The total includes $10,254 in 1998; $69,212.88 in 1999 (less a repayment of $28,945); $208,480 in 2000; and $43,537 in 2001, followed by $206,000 in June 2001. In addition to monies advanced from Stuart, Robert claims that he provided money, including a cash advance of $10,000 that he gave to Pearle.

Quoted language is taken from the identified clause in the Ground Lease, Trial Exhibit 1.

The last page of the Compass Bank commitment letter packet includes an analysis from the bank loan officer which states, “Approval of this loan is based upon the favorable LTV [loan to value] ratio and the strength given to the Wareham Public School System lease.” Trial Exhibit 110.

 It is not unusual that in the wake of a failed venture a party, in hindsight, reviews the course of events and finds what they believe to be proof of some ulterior or sinister motive on the part of the other party. All sides have engaged in that endeavor here, but the Court, viewing the evidence objectively and with dispassion, is comfortable in concluding that all involved had a good faith interest in seeing the Homestead restored if it could be done.

Trial Exhibit 3, m.b.

Likewise, the sub-lease to Marks is not enforceable against Southcoast because the Trust breached its lease obligations resulting in the termination of the Ground Lease. A sub-lessee has no greater right as against a landlord than does the original tenant.

In their requests for rulings of law, Southcoast cites cases for the proposition that a loan agreement cannot be enforced where terms such as time and method of repayment, events of default, and the manner and method of repaying interest remain indefinite. See, e.g., The Community Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537, 556 (1998); Geo. E. Wilcox, Inc. v. Shell E. Petroleum Products, 233 Mass. at 390; Marine Midland Bank v. Herriott, 10 Mass.App.Ct. 743, 744 (1980); Durmic v. J.P. Morgan Chase Bank, N.A., No. 10-CV-10380-RGS, 2010 WL 482632 (D.Mass. November 24, 2010). These cases are distinguishable in that they deal with preliminary negotiations where the parties agree to some but not all of the material terms, rendering the agreement ambiguous or indefinite. Here, by contrast, there was a core agreement to loan monies, and a meeting of the minds regarding the obligation for repayment at some point in the future. In reliance on that understanding, monies were in fact advanced by the Marks, and used for the benefit of the Trust.

The loan amount claimed at the outset of litigation was substantially higher, totaling $563,492.97.